UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ESTHER KOGUS, Derivatively on Behalf of AMERICAN ELECTRIC POWER COMPANY, INC., | Case No. |
| | District Judge: |
| Plaintiff, | Magistrate Judge: |
| v. | |
| NICHOLAS K. AKINS, BRIAN X. TIERNEY, JOSEPH M. BUONAIUTO, THOMAS E. HOAGLIN, LINDA A. GOODSPEED, RALPH D. CROSBY, JR., SARA MARTINEZ TUCKER, DAVID J. ANDERSON, RICHARD D. NOTEBAERT, SANDRA BEACH LIN, STEPHEN S. RASMUSSEN, OLIVER G. RICHARD, III, J. BARNIE BEASLEY, JR., MARGARET M. MCCARTHY, and LIONEL L. NOWELL III, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | |
| - and - | |
| AMERICAN ELECTRIC POWER COMPANY, INC., a New York Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant American Electric Power Company, Inc. ("American Electric," "AEP," or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to American Electric's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed American Electric to billions of dollars in potential liability for violations of state and federal law.

2.     American Electric is an electric public utility holding company based in Ohio that engages in the generation, transmission, and distribution of electricity.  In recent years the defendants have claimed that the Company is in the process of "[r]epositioning for [s]uccess" by focusing on clean energy.  Despite these public claims, behind the scenes the Company supported a campaign to bailout two 1950s coal power plants (that it owned nearly half of) and roll back environmental friendly rules and regulations.  It did so by funneling lobbying funds to "dark money" organizations that did not have to disclose their financial supporters.

3.     As if this wrongdoing was not bad enough, the dark money organizations the Company supported were actually necessary conduits for the largest political scandal in Ohio history.  On July 17, 2020, the U.S. government charged Ohio House Speaker Larry Householder ("Householder") with racketeering and other assorted wrongdoing.  In a classic story of corruption, Householder pressured Ohio's large energy companies to support him and provide him with payments and in return he would ensure they received favorable legislation.

4.     The deal was struck.  According to the criminal complaint, Ohio energy companies provided Householder with approximately $60 million.  In particular, these companies paid the

money to a 501(c)(4) "dark money" operation called "Generation Now." Generation Now was controlled by Householder. He then used that money to support his chosen candidate, as well as personal uses, such as paying off credit card debt and purchasing property in Florida. It has since been revealed that American Electric is one of the companies that provided funding to Generation Now.

5. With the support he received through the use of Generation Now's dark money, Householder rose to the position of Ohio House Speaker in January 2019. Making good on his word, Householder then repaid his benefactors. In particular, he pushed through House Bill 6 ("HB 6") in July 2019. HB 6 provided a billion-dollar bailout out for the coal power facilities partly owned by the Company, as well as two nuclear power plants, and gutted subsidies for renewable energy and energy efficiency.

6. HB 6 was unpopular with Ohioans. It imposed an additional surcharge on residents and businesses. As the groundswell against HB 6 rose, the bill's opponents attempted to organize a referendum on the bill for the 2020 election. The dark money then turned against the referendum, putting forth, among other things, xenophobic ads that claimed that the Chinese government was behind the petition for the referendum. Generation Now's dark money was also used in less obvious ways, such as hiring the top fifteen petition signature-gathering firms in order to ensure these companies did not work on the referendum. As a result, these organizations were paid to do nothing.

7. On July 25, 2020, the *Columbus Dispatch* published an article that connected the Company to Generation Now. In particular, a nonprofit operating solely with American Electric funds gave money to Generation Now. The article also detailed other dark money organizations supported with the Company's funds.

8.     In the wake of this disclosure, American Electric's stock plunged more than 5%, erasing over $2 billion in market capitalization.

9.     Further, as a direct result of this unlawful course of conduct, American Electric is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of Ohio on behalf of investors who purchased American Electric's shares.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) American Electric maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to American Electric, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13. Plaintiff Esther Kogus was a stockholder of American Electric at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current American Electric stockholder. Plaintiff is a citizen of California.

**Nominal Defendant**

14. Nominal Defendant American Electric is a New York corporation with principal executive offices located at 1 Riverside Plaza, Columbus, Ohio. Accordingly, American Electric is a citizen of New York and Ohio. American Electric is an electric public utility holding company that provides generation, transmission, and distribution services to retail customers in Arkansas, Indiana, Kentucky, Louisiana, Michigan, Ohio, Oklahoma, Tennessee, Texas, Virginia, and West Virginia. As of December 31, 2019, the subsidiaries of American Electric had approximately 17,408 employees.

**Defendants**

15. Defendant Nicholas K. Akins ("Akins") is American Electric's Chief Executive Officer ("CEO") and has been since November 2011; President and has been since January 2011; Chairman of the Board of Directors (the "Board") and has been since January 2014; director and has been since October 2011; and Chairman and CEO of all American Electric's major subsidiaries and has been since November 2011. Defendant Akins was also Executive Vice President, Generation from August 2006 to December 2010; and held various positions of increasing responsibility at American Electric subsidiaries from at least 1999 to 2006. Defendant Akins is a member of American Electric's Policy Committee and has been since at least March 2016. Defendant Akins is named as a defendant in a related securities class action complaint that alleges

he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Akins knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings. American Electric paid defendant Akins the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $1,475,654 | $8,775,003 | $3,600,000 | $530,151 | $111,628 | $14,492,436 |
| 2018 | $1,415,423 | $7,564,313 | $2,900,000 | $207,401 | $114,891 | $12,202,028 |
| 2017 | $1,375,000 | $7,983,420 | $1,700,000 | $361,001 | $111,040 | $11,530,461 |
| 2016 | $1,325,077 | $6,720,027 | $3,000,000 | $323,949 | $103,687 | $11,472,740 |

Defendant Akins is a citizen of Ohio.

16.     Defendant Brian X. Tierney ("Tierney") is American Electric's Chief Financial Officer and Executive Vice President and has been since October 2009. Defendant Tierney also held various positions of increasing responsibility at American Electric subsidiaries from 1998 to 2003. Defendant Tierney is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Tierney knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings. American Electric paid defendant Tierney the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $793,039 | $4,064,681 | $1,088,000 | $470,138 | $95,560 | $6,511,418 |
| 2018 | $771,958 | $1,945,785 | $890,000 | - | $59,547 | $3,667,290 |
| 2017 | $750,000 | $2,128,899 | $555,000 | $462,223 | $98,262 | $3,994,384 |
| 2016 | $730,800 | $1,895,038 | $990,000 | $131,575 | $95,026 | $3,842,439 |

Defendant Tierney is a citizen of Ohio.

17. Defendant Joseph M. Buonaiuto ("Buonaiuto") is American Electric's Chief Accounting Officer and Controller and has been since at least March 2001; and Senior Vice President and has been since at least March 2005. Defendant Buonaiuto is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Buonaiuto knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings. Defendant Buonaiuto is a citizen of Ohio.

18. Defendant Thomas E. Hoaglin ("Hoaglin") is American Electric's Lead Director and has been since April 2012, and a director and has been since December 2007. Defendant Hoaglin is a member of the Audit Committee and has been since at least March 2019; Chair and a member of the Committee on Directors and Corporate Governance (the "Governance Committee") and has been since at least March 2016; and a member of the Policy Committee and has been since at least March 2016. American Electric paid defendant Hoaglin the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $165,500 | $157,500 | $872 | $323,872 |
| 2018 | $165,500 | $157,500 | $840 | $323,840 |
| 2017 | $145,500 | $157,500 | $803 | $303,803 |
| 2016 | $145,500 | $157,500 | $803 | $303,803 |

Defendant Hoaglin is a citizen of Ohio.

19. Defendant Linda A. Goodspeed ("Goodspeed") is an American Electric director and has been since October 2005. Defendant Goodspeed is a member of the Audit and Policy Committees and has been since at least March 2016. American Electric paid defendant Goodspeed the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,500 | $157,500 | $872 | $278,872 |
| 2018 | $120,500 | $157,500 | $840 | $278,840 |
| 2017 | $120,500 | $157,500 | $803 | $278,803 |
| 2016 | $120,500 | $157,500 | $803 | $278,803 |

Defendant Goodspeed is a citizen of Florida.

20.     Defendant Ralph D. Crosby, Jr. ("Crosby") is an American Electric director and has been since January 2006. Defendant Crosby has been a member of the Policy Committee since at least March 2016. American Electric paid defendant Crosby the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $140,500 | $157,500 | $872 | $298,872 |
| 2018 | $140,500 | $157,500 | $840 | $298,840 |
| 2017 | $135,500 | $157,500 | $803 | $293,803 |
| 2016 | $135,500 | $157,500 | $803 | $293,803 |

Defendant Crosby is a citizen of Virginia.

21.     Defendant Sara Martinez Tucker ("Tucker") is an American Electric director and has been since January 2009. Defendant Tucker is a member of the Governance and Policy Committees and has been since at least March 2016, and was also a member of the Audit Committee from at least March 2016 to at least March 2018. American Electric paid defendant Tucker the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,500 | $157,500 | $872 | $278,872 |
| 2018 | $120,500 | $157,500 | $840 | $278,840 |
| 2017 | $120,500 | $157,500 | $803 | $278,803 |
| 2016 | $120,500 | $157,500 | $5,803 | $283,803 |

Defendant Tucker is a citizen of Texas.

22.     Defendant David J. Anderson ("Anderson") is an American Electric director and has been since April 2011. Defendant Anderson is Chair of the Audit Committee and has been

since at least March 2020, and a member and has been since at least March 2016; a member of the Policy and Finance Committees and has been since at least March 2016; and was also Chair of the Finance Committee from at least March 2016 to at least March 2019. American Electric paid defendant Anderson the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $135,500 | $157,500 | $872 | $293,872 |
| 2018 | $135,500 | $157,500 | $840 | $293,840 |
| 2017 | $120,500 | $157,500 | $803 | $278,803 |
| 2016 | $120,500 | $157,500 | $803 | $278,803 |

Defendant Anderson is a citizen of Massachusetts.

23.     Defendant Richard C. Notebaert ("Notebaert") is an American Electric director and has been since April 2011. Defendant Notebaert is a member of the Governance, Policy, and Finance Committees and has been since at least March 2016. American Electric paid defendant Notebaert the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,500 | $157,500 | $872 | $278,872 |
| 2018 | $120,500 | $157,500 | $840 | $278,840 |
| 2017 | $115,500 | $157,500 | $803 | $273,803 |
| 2016 | $115,500 | $157,500 | $803 | $273,803 |

Defendant Notebaert is a citizen of Florida.

24.     Defendant Sandra Beach Lin ("Lin") is an American Electric director and has been since July 2012. Defendant Lin is a member of the Audit, Governance, and Policy Committees and has been since at least March 2016, and was also Chair of the Policy Committee from at least March 2016 to at least March 2018. American Electric paid defendant Lin the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,500 | $157,500 | $872 | $278,872 |
| 2018 | $121,750 | $157,500 | $840 | $280,090 |
| 2017 | $120,500 | $157,500 | $803 | $278,803 |
| 2016 | $120,500 | $157,500 | $803 | $278,803 |

Defendant Lin is a citizen of Texas.

25.     Defendant Stephen S. Rasmussen ("Rasmussen") is an American Electric director and has been since September 2012.  Defendant Rasmussen is a member of the Governance, Policy, and Finance Committees and has been since at least March 2016.  American Electric paid defendant Rasmussen the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $120,500 | $157,500 | $872 | $278,872 |
| 2018 | $120,500 | $157,500 | $840 | $278,840 |
| 2017 | $115,500 | $157,500 | $803 | $273,803 |
| 2016 | $115,500 | $157,500 | $803 | $273,803 |

Defendant Rasmussen is a citizen of Iowa.

26.     Defendant Oliver G. Richard, III ("Richard") is an American Electric director and has been since January 2013.  Defendant Richard is a member of the Policy Committee and has been since at least March 2016.   American Electric paid defendant Richard the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $125,500 | $157,500 | $2,872 | $285,872 |
| 2018 | $124,250 | $157,500 | $840 | $282,590 |
| 2017 | $115,500 | $157,500 | $4,803 | $277,803 |
| 2016 | $115,500 | $157,500 | $803 | $273,803 |

Defendant Richard is a citizen of Louisiana.

27.     Defendant J. Barnie Beasley, Jr. ("Beasley") is an American Electric director and has been since February 2014.  Defendant Beasley has been a member of the Policy Committee since at least March 2016; and was also a member of the Audit Committee from at least March

2016 to at least March 2019. American Electric paid defendant Beasley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $138,000 | $157,500 | $1,872 | $297,372 |
| 2018 | $135,500 | $157,500 | $1,840 | $294,840 |
| 2017 | $120,500 | $157,500 | $1,803 | $279,803 |
| 2016 | $120,500 | $157,500 | $1,803 | $279,803 |

Defendant Beasley is a citizen of Georgia.

28.     Defendant Margaret M. McCarthy ("McCarthy") is an American Electric director and has been since April 2019. Defendant McCarthy is a member of the Audit and Policy Committees and has been since at least March 2020; and Chair of the Policy Committee and has been since at least November 2020. American Electric paid defendant McCarthy the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $90,375 | $118,125 | $872 | $209,372 |

Defendant McCarthy is a citizen of Massachusetts.

29.     Defendant Lionel L. Nowell III ("Nowell") was an American Electric director from August 2004 to April 2020. Defendant Nowell was Chair and a member of the Audit Committee from at least March 2016 to at least March 2019; and a member of the Governance, Policy, and Finance Committees from at least March 2016 to at least March 2020. American Electric paid defendant Nowell the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $145,500 | $157,500 | $872 | $303,872 |
| 2018 | $145,500 | $157,500 | $840 | $303,840 |
| 2017 | $145,500 | $157,500 | $803 | $303,803 |
| 2016 | $145,500 | $157,500 | $803 | $303,803 |

Defendant Nowell is a citizen of Florida.

30.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15, 18-29 are referred to herein as the "Director Defendants."  Collectively, the defendants identified in ¶¶15-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe American Electric and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage American Electric in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of American Electric and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of American Electric were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of American Electric were required to, among other things: (i) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and (ii) remain informed as to how American Electric conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of American Electric, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that wasted the Company's assets, resulted in false and misleading statements, and caused American Electric to incur substantial damage.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of American Electric, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, American Electric has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Policy Committee**

36.     In addition to the above duties, the members of the Policy Committee have additional duties.  Pursuant to its Charter, the "Policy Committee [is] responsible for examining the Company's policies on major public issues affecting the Company and its subsidiaries, including environmental, industry change and other matters, as well as established policies that affect the relationship of the Company and its subsidiaries to their service areas and the general public."

- 13 -

37.     The members of the Policy Committee are required to:

1. Report periodically and upon request to the Board of Directors regarding environmental, industry change and other policy matters, as well as established policies that affect the relationship of the Company and its subsidiaries to their service areas and the general public.

2. Counsel the Chief Executive Officer and other members of management on any policy matters presented to the Committee for its consideration and study.

**Additional Duties of the Governance Committee**

38.     In addition to the above duties, the members of the Governance Committee have additional duties.  Most importantly, and as explained in the Company's proxy statements, the members of the Governance Committee oversee the Corporate Accountability Reports, "including the material concerning political contributions."

39.     Pursuant to its Charter, the Governance Committee is also responsible for developing and recommending to the greater Board a set of governance principles.  It is also required to:

> Oversee on a continuing basis the implementation of the AEP Corporate Compliance Program, including reporting by the chief compliance officer, the development of specific programs of legal compliance in various important areas of concern to the operation of AEP System companies, and the designation of successor chief compliance officers.

**Additional Duties of the Audit Committee Defendants**

40.     In addition to these duties, under its Charter, the members of the Audit Committee owe and owed specific duties to American Electric to assist the Board in fulfilling its responsibilities with respect to the oversight of:

(i)     The quality and integrity of the Company's financial statements;

(ii)    The Company's compliance with financial reporting-related legal and regulatory requirements including internal control over financial reporting…; and

*        *        *

- 14 -

(v) The Company's process of identifying and managing major risks, including strategic, operational, and financial risks.

41. The Audit Committee Charter also states that the members of the Audit Committee are required to:

4. Review periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.

5. Review and discuss with management the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

\* \* \*

D. *Legal Compliance/General*

1. Oversee the process of identifying major enterprise risks, including strategic, operational, and financial risks, and assure that all such risks are communicated to the Board for assignment of oversight among the Board and its Committees.

The Audit Committee is also responsible for oversight of the elements of the Company's risks that are within the scope of the Committee's responsibilities as assigned by the Board of Directors from time to time.

\* \* \*

3. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal control over financial reporting, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

4. Perform any functions required to be performed by it or otherwise appropriate under applicable law, rules or regulations, the Company's by-laws and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC.

5. Initiate inquiries of areas of special interest.

\* \* \*

2. Report regularly to the full Board of Directors:

(i) with respect to any issues that arise concerning the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor or the performance of the internal audit group;

(ii) following all meetings of the Committee; and

(iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.

## SCANDAL ERUPTS AROUND HB 6

42.     HB 6 was essentially a billion-dollar bailout of two failing Ohio nuclear power plants and two 1950s era coal-fired power plants.  The two coal-fired power plants are owned by Ohio Valley Electric Corporation ("OVEC").  OVEC has been selling electricity for less than it costs to generate for nearly a decade.  Under HB 6, Ohioans are forced to subsidize these plants through 2030 at an estimated cost of $700 million (with an additional bailout expected at that point).  American Electric owns approximately 43% of OVEC.

43.     HB 6 mandated that residential customers pay $0.85 each month and major industrial plants pay $2,400 each month on top of their electricity bills.  This money was then largely sent to the failing power plants.  The bill also did away with incentives for solar and wind projects and eliminated programs that helped residents use less power through buying energy-saving appliances or upgrading heating and cooling systems.

44.     On July 23, 2019, Ohio Governor Mike DeWine signed HB 6.  It was immediately unpopular and a campaign soon started to add a referendum on the bill to the 2020 election in order to remove it.

45.     On July 21, 2020, federal officials arrested Ohio House Speaker Householder and four others in connection with a $60 million racketeering and bribery investigation.  HB 6 played a starring role in the criminal complaint.  According to the criminal complaint, Householder

engaged in a brazen attempt to expand his political power and enrich himself and his co-conspirators. In 2016, Householder won back his seat after a decade out of the Ohio state legislature. In or around January 2017, Householder entered into an agreement with the major Ohio energy companies. In exchange for millions of dollars in payments and their support for Householder's bid to become Speaker of the House, Householder would usher through a bill that would provide substantial benefits to these energy companies. That promised bill would become HB 6.

46.     According to the criminal complaint, a 501(c)(4) "dark money" operation called "Generation Now" was the main conduit of the illegal money. In exchange for Householder and his associates' help, the offending energy companies paid Generation Now approximately $60 million. Householder secretly controlled Generation Now. Generation Now used this money to pay Householder's campaign staff as well as back the campaigns of twenty-one different state candidates in the 2018 primary and general elections. Householder himself received over $400,000 in personal benefits, including funds to settle a personal lawsuit, to pay off credit card debt, and for costs associated with his house.

47.     A second group supported by the illegal payments, Ohioans for Energy Security, spent millions of dollars on advertisements, including ones that warned Ohioans that the Chinese would take over Ohio's energy grid if voters repealed the bailout. Generation Now also hired the top signature collection firms in order to thwart the repeal the efforts from having competent assistance in gathering the signatures necessary to put the proposed referendum on the ballot. Generation Now paid at least fifteen such firms not to work.

48.     On July 25, 2020, the *Columbus Dispatch* published an article titled "Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign." This was the first time that

American Electric was directly linked to the groups at the center of the criminal investigation. The article reported that a nonprofit funded solely by American Electric gave money to Generation Now. It also stated that another interest group's spending that was part of the criminal investigation was funded exclusively by American Electric. In particular, the article stated:

> A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.

> Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

> Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

> An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."

> A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Power, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

> The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

> The board of Empowering Ohio's Economy -- which approved the H.B. 6-related spending – includes AEP's top lobbyist, one of Republican Householder's predecessors as House speaker, a former congressman and a friend of Republican Gov. Mike DeWine.

> AEP spokesman Scott Blake said the utility has not been contacted by investigators "and none of the wrongful conduct in the criminal complaint involves AEP or its subsidiaries. Neither AEP nor any of its subsidiaries made any contributions to Generation Now."

> The utility gives to a variety of social welfare nonprofits, including Empowering Ohio's Economy, to support its mission of promoting economic and business development and education programs, he said. AEP does not comment on specific contributions or amounts, he added.

"These contributions were done appropriately, and we have every reason to believe that the organizations we support have acted in a lawful and ethical manner," Blake added.

AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio electricity customers. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.

The plants -- Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana -- were built in the mid-1950s to supply electricity to the former uranium-enrichment plant near Piketon, Ohio. AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.

The board of directors of Empowering Ohio's Economy includes Thomas Froehle, vice president of external affairs for AEP -- its top lobbyist. He testified before the General Assembly in support of House Bill 6. AEP registered 23 lobbyists to work the 132 lawmakers to pass the legislation last year.

A message seeking comment was left with Froehle. AEP confirmed he remains a board member.

Other board members include former Republican House Speaker Jo Ann Davidson; former U.S. Rep. David Hobson, R-Springfield; and J.B. Hadden, a lawyer who has represented AEP and a friend to DeWine. Hadden, president of the nonprofit's board, was treasurer of DeWine's 2014 attorney general re-election campaign.

"I don't know what they were up to," Hadden said of Generation Now and Coalition for Opportunity & Growth, adding he did not recall which board member sought the funding. He said he never discussed the matter with DeWine.

While he did not have access to records, Hadden disputed the nonprofit received $13 million in funding as listed in the FBI affidavit. The group's IRS filings show it received $8 million total in 2015 and 2016, with no contributions in 2017-18. It listed a year-end cash balance of nearly $3.9 million in 2018. Prior IRS tax forms, and the 2019 filing, are not available online.

The group's address is listed as the Downtown office of Davidson, who serves as secretary-treasurer. A working telephone number for Hobson could not be located. Board members receive no compensation.

The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

- 19 -

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

Despite those amounts, the Coalition for Opportunity & Growth reported spending only $102,835 in its filings with the Federal Election Commission.

Empowering Ohio's Economy spent $3.7 million between 2016 and 2018 on a variety of charitable and civic endeavors. Its biggest expenditure of $750,000 went to the host committee of the Republican National Convention in Cleveland in 2016.

It also gave $300,000 to the Capitol Square Foundation, of which Davidson is a board member and which benefits the Statehouse, and $250,000 to Two Paths America, a nonprofit created amid former GOP Gov. John Kasich's 2016 presidential run to promote his positions.

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history.

49.    Additional news has slowly leaked out about American Electric's role.    On

December 2, 2020, the *Dayton Daily News* reported that American Electric gave $900,000 to the

dark money groups at the center of the HB 6 scandal.  In particular, it stated:

A nonprofit funded by Columbus-based American Electric Power gave $900,000 over three years to two groups that don't have to disclose their donors and are involved in a federal public corruption investigation, records show.

IRS documents filed in November and obtained by the Dayton Daily News show the nonprofit Empowering Ohio's Economy Inc. donated $550,000 in 2019, $50,000 in 2018 and $100,000 in 2017 to Generation Now, which federal prosecutors allege was the primary vehicle for funneling bribes to former Ohio House Speaker Larry Householder.

Empowering Ohio's Economy also gave $200,000 to Coalition for Growth & Opportunity, another nonprofit group linked to the federal case.

"Obviously, knowing what we know now, we wouldn't have made the donations," said J.B. Hadden, an Empowering Ohio's Economy board member.

Empowering Ohio's Economy is run by a five member board that includes former Dayton area congressman Dave Hobson, former Ohio House speaker JoAnn Davidson, AEP's top lobbyist Tom Froehle, and Hadden, an attorney specializing in public policy and energy issues.

Empowering Ohio is designed to promote Ohio for business and tourism, according to its tax filing. It has given to charity organizations and political groups.

Last year, it also gave $100,000 to the Rule of Law Defense Fund, $50,000 to Liberty Ohio and $2 million to Open Road Path.

In 2018, its giving included $200,000 to the Capitol Square Foundation, $300,000 to Ohio Works, $525,000 to State Solutions Inc, $50,000 to Rule of Law Defense Fund and other entities. In 2017, its giving included $250,000 to Two Paths America, $50,000 to Ohioans for Justice and $50,000 to Ohio Works as well as other groups.

AEP supported House Bill 6, which extended monthly surcharges earmarked to help coal-fired power plants owned by the Ohio Valley Electricity Corp. OVEC's consortium of owners includes AEP, Duke and DP&L.

HB6 is at the center of a public corruption case. Former Ohio House speaker Larry Householder and four other men are charged with racketeering. Prosecutors allege an unnamed company, identified through descriptions as Akron-based FirstEnergy Corp. and its former subsidiary, funneled more than $60 million in bribe money to Generation Now and other dark money groups. The money was used to elect pro-Householder Republicans to the Ohio House so Householder could return as House speaker. In turn, Householder helped pass HB6 and defend it from a referendum attempt in the fall of 2019.

Householder, former Ohio GOP chairman Matt Borges and lobbyist Neil Clark have pleaded not guilty. Two other men pleaded guilty in October. FirstEnergy fired its chief executive and two senior vice presidents for violating company policies and failing to inform board members about a $4 million payment to a consulting firm run by someone who was subsequently appointed as a state regulator over utilities.

## THE FALSE AND MISLEADING STATEMENTS

50.    The Invidious Defendants' false statements concerning the Company's lobbying practices and interaction with the Ohio state legislature dates back years.  On November 2, 2016,

American Electric filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q") with the SEC.  The Q3 2016 Form 10-Q discussed the Company impairment for certain assets, the proposal to restructure Ohio's energy regulations, and that the Company may need to lose some facilities due to regulations.  In particular, the Q3 2016 Form 10-Q stated:

> In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets. The evaluation was performed using generating unit specific estimated future cash flows and resulted in a material impairment of certain merchant generation fleet assets. As a result, AEP recorded a pretax impairment of $2.3 billion ($1.5 billion, net of tax) in Asset Impairments and Other Related Charges on the statement of operations related to 2,684 MWs of Ohio merchant generation including Cardinal Unit 1, 43.5% ownership interest in Conesville Unit 4, Conesville Units 5-6, 26.0% ownership interest in Stuart Units 1-4, and 25.4% ownership interest in Zimmer Unit 1, as well as Putnam coal and I&M's Price River coal reserves, Desert Sky and Trent Wind Farms and the merchant generation portion of the Oklaunion Plant. As of September 30, 2016, the remaining net book value of these assets is $50 million. See "Merchant Generating Assets (Generation & Marketing Segment)" section of Note 6 for additional information.

> Management continues to evaluate potential alternatives for the remaining merchant generation assets. These potential alternatives may include, but are not limited to, propose restructuring of Ohio electricity regulations to allow certain of these assets to be acquired by OPCo for the benefit of its customers, transfer or sale of AEP's ownership interests, or a wind down of merchant coal-fired generation fleet operations. AEP is also continuing a separate strategic review and evaluating alternatives related to the 48 MW Racine Hydroelectric Plant. Management has not set a specific time frame for a decision on these assets. These alternatives could result in additional losses which could reduce future net income and cash flows and impact financial condition.

*       *       *

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs.

***Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.***

51.     On February 28, 2017, American Electric filed its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") with the SEC. Defendants Akins, Tierney, Buonaiuto, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, Notebaert, Nowell, Rasmussen, Richard, and Tucker signed the 2016 Form 10-K. The 2016 Form 10-K contained an entire section discussing the regulation of the Company. In particular, the 2016 Form 10-K stated:

**REGULATION**

*General*

AEP's vertically integrated public utility subsidiaries' retail rates and certain other matters are subject to traditional cost-based regulation by the state utility commissions. AEP's vertically integrated public utility subsidiaries are also subject to regulation by the FERC under the Federal Power Act with respect to wholesale power and transmission service transactions. I&M is subject to regulation by the NRC under the Atomic Energy Act of 1954, as amended, with respect to the operation of the Cook Plant. AEP and its vertically integrated public utility subsidiaries are also subject to the regulatory provisions of EPACT, much of which is administered by the FERC.

*Rates*

Historically, state utility commissions have established electric service rates on a cost-of-service basis, which is designed to allow a utility an opportunity to recover its cost of providing service and to earn a reasonable return on its investment used in providing that service. A utility's cost of service generally reflects its operating expenses, including operation and maintenance expense, depreciation expense and taxes. State utility commissions periodically adjust rates pursuant to a review of (a) a utility's adjusted revenues and expenses during a defined test period and (b) such utility's level of investment. Absent a legal limitation, such as a law limiting the frequency of rate changes or capping rates for a period of time, a state utility commission can review and change rates on its own initiative. Some states may initiate reviews at the request of a utility, customer, governmental or other representative of a group of customers. Such parties may, however, agree with one another not to request reviews of or changes to rates for a specified period of time.

Public utilities have traditionally financed capital investments until the new asset is placed in service. Provided the asset was found to be a prudent investment, it was then added to rate base and entitled to a return through rate recovery. Given long lead times in construction, the high costs of plant and equipment and volatile capital

markets, management is actively pursuing strategies to accelerate rate recognition of investments and cash flow. AEP representatives continue to engage state commissioners and legislators on alternative ratemaking options to reduce regulatory lag and enhance certainty in the process. These options include pre-approvals, a return on construction work in progress, rider/trackers, formula rates and the inclusion of future test-year projections into rates.

The rates of AEP's vertically integrated public utility subsidiaries are generally based on the cost of providing traditional bundled electric service (i.e., generation, transmission and distribution service). Historically, the state regulatory frameworks in the service area of the AEP vertically integrated public utility subsidiaries reflected specified fuel costs as part of bundled (or, more recently, unbundled) rates or incorporated fuel adjustment clauses in a utility's rates and tariffs. Fuel adjustment clauses permit periodic adjustments to fuel cost recovery from customers and therefore provide protection against exposure to fuel cost changes.

52.     In a section titled "Competition," the 2016 Form 10-K discussed that changes in regulation and public policy reforms can greatly affect the Company. It also highlighted the Company's compliance with clean energy rules. In particular, the 2016 Form 10-K stated:

The vertically integrated public utility subsidiaries of AEP, like the electric industry generally, face competition in the sale of available power on a wholesale basis, primarily to other public utilities and power marketers. Federal policy generally fosters competition in the wholesale market by creating a generation market and mandates that all generators have equal access to transmission services. As a result, more generators participate in this market. The principal factors in competing for wholesale sales are price (including fuel costs), reliability of service, and availability of capacity and power.

Technology advancements, increased demand for clean energy, changing consumer behaviors, low-priced and abundant natural gas, and regulatory and public policy reforms are among the catalysts for transformation within the industry that impact competition for AEP's vertically integrated public utility subsidiaries. AEP's vertically integrated public utility subsidiaries also compete with self-generation and with distributors of other energy sources, such as natural gas, fuel oil, renewables and coal, within their service areas. The primary factors in such competition are price, reliability of service and the capability of customers to utilize alternative sources of energy other than electric power. With respect to competing generators and self-generation, the public utility subsidiaries of AEP believe that they currently maintain a competitive position.

Changes in regulatory policies and advances in newer technologies for batteries or energy storage, fuel cells, microturbines, wind turbines and photovoltaic solar cells are reducing costs of new technology to levels that are making them competitive

with some central station electricity production. The costs of photovoltaic solar cells in particular have continued to become increasingly competitive. The ability to maintain relatively low cost, efficient and reliable operations and to provide cost-effective programs and services to customers are significant determinants of AEP's competitiveness.

While the adoption rate of distributed generation in AEP's service areas has not reached the levels seen in other parts of the country, AEP's vertically integrated utility companies are focused on providing customers with more choices by working with regulators and policymakers to expand, and potentially accelerate, renewable energy offerings. Such additional customer choices consider not only long-term cost, but are also focused on expanding resource diversity. This includes proposed new revenue structures that enable deployment of advanced technologies and resources. In 2015, AEP formed an Enterprise Technology Council to develop and deploy new programs and services designed to receive regulatory support. The vertically integrated public utility subsidiaries of AEP believe that the reliability of their service, the limited ability of customers to substitute other economical sources for electric power and their ability to cost-effectively deploy advanced technologies, such as solar, on a large scale place them in a favorable competitive position.

In the event that alternative generation resources are mandated, subsidized or encouraged through legislation or regulation or otherwise are economically competitive and added to the available generation supply, such resources could displace a higher marginal cost fossil plant, which could reduce the price at which market participants sell their electricity. These events could cause AEP to retire generating capacity prior to the end of its estimated useful life. AEP typically recovers undepreciated plant balances and associated operating costs, each including a return, from customers through regulated rates in regulated jurisdictions. Failure to recover these costs could reduce future net income and cash flows and possibly harm financial condition.

Recent changes in the global economy have led to increased competition for many industrial customers in the United States, including those served by the AEP System. Industrial customers that are downsizing or reorganizing often close a facility based upon its costs, which may include, among other things, the cost of electric power. The vertically integrated public utility subsidiaries of AEP work with such customers to meet their business needs. For example, various off-peak or interruptible supply options may be provided pursuant to tariffs filed with, and approved by, the various state commissions. The vertically integrated public utility subsidiaries of AEP also work with customers that seek to source more of their electric power from renewable resources. Depending on the jurisdiction, customers may have access to green power tariffs. In other instances, AEP purchases renewable power that is available to all customers in a specific jurisdiction

53.    On April 28, 2017, American Electric filed its Quarterly Report on Form 10-Q for the first quarter period ended March 31, 2017 (the "Q1 2017 Form 10-Q") with the SEC.  The Q1 2017 Form 10-Q talked about American Electric's compliance with climate regulations and requirements and that the Company may need to close some facilities due to these regulations.  In particular, the Q1 2017 Form 10-Q stated:

### Climate Change, $CO_2$ Regulation and Energy Policy

The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. ***Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.***

*        *        *

Federal and state legislation or regulations that mandate limits on the emission of CO2 could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.

*        *        *

In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets.

54.    On May 25, 2017, American Electric released its 2017 Corporate Accountability Report (the "2017 CAR").  The members of the Board's Governance Committee specifically reviewed and approved the 2017 CAR, including materials concerning political contributions.  The 2017 CAR contained a message from defendant Akins claiming, "We are transforming our business to create sustainable economic, social and environmental value for all of our

stakeholders." The 2017 CAR claimed that in 2015, the Company had "[r]eposition[ed] for [s]uccess" by, among other things, updating the Company brand "to reflect our clean energy transition[.]" In a section titled "Carbon and Climate," the 2017 CAR stated:

> AEP's carbon footprint has been dramatically reduced in recent years. In 2017, we estimate that our carbon emissions will be 56 percent below 2000 levels. In addition to new renewable sources, the sale of merchant generation, previous coal unit retirements and economic factors such as lower natural gas prices, all contributed to this decline.

> Carbon and climate change continue to take center stage in discussions with many of our stakeholders. Investors and environmental groups ask us about how we will continue to transition to a less-carbon-intensive energy future, and customers want more access to renewable resources to meet their own clean energy objectives.

> Our path forward is clear. We do not foresee adding new coal. However, our remaining fossil and nuclear units provide critical 24/7 power to the grid and a resilient source of power for all customers. We need these resources to ensure a continued balanced portfolio of resources.

> Regardless of the political environment and the fate of the Clean Power Plan or other changes that may be in the works, AEP remains committed to a clean energy future because that is what our customers and stakeholders expect. We have always maintained that any approach to climate change should be economy-wide and addressed through legislative policy. That said, the U.S. Supreme Court has ruled that the U.S. Environmental Protection Agency can regulate carbon, so we are preparing for that prospect. Our planning criteria includes a proxy cost of carbon when developing all of our resource plans to prepare for that eventuality.

> We will continue to engage with all of our stakeholders on carbon and climate change and to be transparent about our plans.

55.     Concerning "regulatory and Public Policy" matters, the 2017 CAR stated:

> The electric utility industry is one of the most highly regulated sectors of the U.S. economy. As our industry undergoes an unprecedented transformation, we are working with our regulators and policymakers at the federal, state and local levels to ensure the appropriate regulatory and legislative reforms are in place to balance the cost of keeping the lights on and the need to modernize the grid with our customers' ability to pay.

> Our generation, transmission and distribution system investments directly affect our customers and shareholders. These long-lived investments must coexist with prevailing policy considerations such as environmental rules, energy efficiency, affordability and reliability. As we transition to a clean energy future, we are

reshaping our asset base in a reliable and affordable manner for our customers, while managing the financial risk for our shareholders and recognizing that the transition will take some time to fully execute.

56.     Concerning "Lobbying and Political Contributions," the 2017 CAR claimed that the Company discloses its lobby activities and political contributions.  It also stated that the Company reviewed its political contributions annually with the Board members on the Corporate Governance committee.  In particular, the 2017 CAR stated:

> The electric utility industry is undergoing a fundamental transformation driven by a number of factors, including new regulations and public policies. For the benefit of all stakeholders, we actively participate in the political process and in lobbying activities at the national, state and local levels.
>
> The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates.
>
> Each year, AEP publicly discloses lobbying activities and political contributions. We also annually report on the portions of membership dues from organizations such as the Business Roundtable (BRT) and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we have a process in place to review political contributions annually with AEP's Board of Director's Committee on Directors and Corporate Governance.

57.     On July 27, 2017, American Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q") with the SEC.  Concerning the Company's Ohio operations and its regulatory and legislative outlook and efforts, the Q2 2017 Form 10-Q stated:

> In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets.

58. On October 27, 2017, American Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC. In the section titled "Climate Change, CO2 Regulation and Energy Policy," the Q3 2017 Form 10-Q stated:

> The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.

> \*       \*       \*

> The Federal EPA has re-examined its legal interpretation of the "best system of emission reduction" and found that based on the statutory text, legislative history, use of similar terms elsewhere in the CAA and its own historic implementation of Section 111 that a narrower interpretation of the term limits it to those designs, processes, control technologies and other systems that can be applied directly to or at the source. Since the primary systems relied on in the CPP are not consistent with that interpretation, the Federal EPA proposes that the rule be withdrawn. Management does not expect a change in AEP's overall strategy as a result of the proposed repeal.

> Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.

59. Regarding the Company's Ohio operations, the Q3 2017 Form 10-Q stated:

In September 2016, due to AEP's ongoing evaluation of strategic alternatives for its merchant generation assets, declining forecasts of future energy and capacity prices, and a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio providing for the recovery of AEP's existing Ohio merchant generation assets, AEP performed an impairment analysis at the unit level on the remaining merchant generation assets in accordance with accounting guidance for impairments of long-lived assets. Based on the impairment analysis performed in the third quarter of 2016, AEP recorded a pretax impairment of $2.3

billion in Asset Impairments and Other Related Charges on the statement of operations.

60.     On February 6, 2018, American Electric issued a press release titled "AEP's Clean Energy Strategy Will Achieve Significant Future Carbon Dioxide Reductions." The press release touted the Company's clean energy plans.  It also directly quoted defendant Akins stating:

> "AEP is focused on modernizing the power grid, expanding renewable energy resources and delivering cost-effective, reliable energy to our customers," said Nicholas K. Akins, AEP chairman, president and chief executive officer. "Our customers want us to partner with them to provide cleaner energy and new technologies, while continuing to provide reliable, affordable energy. Our investors want us to protect their investment in our company, deliver attractive returns and manage climate-related risk. This long-term strategy allows us to do both."

61.     On February 23, 2018, American Electric filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Akins, Tierney, Buonaiuto, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, Notebaert, Nowell, Rasmussen, Richard, and Tucker signed the 2017 Form 10-K.   In the 2017 Form 10-K, these defendants claimed that the Board was reviewing the risks posed by new environmental rules and regulations and involved in learning about new regulations.  In particular, the 2017 Form 10-K stated:

> ### *Corporate Governance*
>
> In response to environmental issues and in connection with its assessment of AEP's strategic plan, the Board of Directors continually reviews the risks posed by new environmental rules and requirements that could accelerate the retirement of coal-fired generation assets. The Board of Directors is informed of any new environmental regulations and proposed regulation or legislation that would affect the company. The Board's Committee on Directors and Corporate Governance oversees the company's annual Corporate Accountability Report, which includes information about the company's environmental, financial and social performance. In addition, as a result of ongoing corporate governance outreach efforts with shareholders, AEP set new carbon dioxide emission reduction goals that were published in a new report in February 2018, "American Electric Power: Strategic Vision for a Clean Energy Future."

62.     In the section titled "Competition" the 2017 Form 10-K explained the Company

faces threats from clean energy and regulatory policies.  In particular, the 2017 Form 10-K stated:

**COMPETITION**

The AEP Generation & Marketing segment subsidiaries face competition for the sale of available power, capacity and ancillary services.  The principal factors of impact are electricity and fuel prices, new market entrants, construction or retirement of generating assets by others and technological advances in power generation. Because most of AGR's remaining generation is coal-fired, lower relative natural gas prices will favor competitors that have a higher concentration of natural gas fueled generation.  Other factors impacting competitiveness include environmental regulation, transmission congestion or transportation constraints at or near generation facilities, inoperability or inefficiencies, outages and deactivations and retirements at generation facilities.

Technology advancements, increased demand for clean energy, changing consumer behaviors, low-priced and abundant natural gas, and regulatory and public policy reforms are among the catalysts for transformation within the industry that impact competition for AEP's Generation & Marketing segment. AGR also competes with self-generation and with distributors of other energy sources, such as natural gas, fuel oil, renewables and coal, within their service areas.  The primary factors in such competition are price, unit availability and the capability of customers to utilize sources of energy other than electric power.

Changes in regulatory policies and advances in newer technologies for batteries or energy storage, fuel cells, microturbines, wind turbines and photovoltaic solar cells are reducing costs of new technology to levels that are making them competitive with some central station electricity production.  The ability to maintain relatively low cost, efficient and reliable operations and to provide cost-effective programs and services to customers are significant determinants of AGR's competitiveness. The costs of photovoltaic solar cells in particular have continued to become increasingly competitive.

In the event that alternative generation resources are mandated, subsidized or encouraged through climate legislation or regulation or otherwise are economically competitive and added to the available generation supply, such resources could displace a higher marginal cost fossil plant, which could reduce the price at which market participants sell their electricity. These events could cause AGR to retire generating capacity prior to the end of its estimated useful life.

This segment's retail operations provide competitive electricity and natural gas in deregulated retail energy markets in six states and Washington, D.C. Each such retail choice jurisdiction establishes its own laws and regulations governing its competitive market, and public utility commission communications and utility default service pricing can affect customer participation in retail competition.

Sustained low natural gas and power prices, low market volatility and maturing competitive environments can adversely affect this business.

This segment also engages in procuring and selling output from renewable generation sources under long-term contracts to creditworthy counterparties. New sources are not acquired without first securing a long-term placement of such power. Existing sources do not face competitive exposure. Competitive unaffiliated suppliers of renewable or other generation could limit opportunities for future transactions for new sources and related output contracts.

63.     On April 26, 2018, American Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q") with the SEC. Like the previous Forms 10-Q, the Q1 2018 Form 10-Q discussed the Company's regulatory and legislative outlook in a section titled "Climate Change, CO2 Regulation and Energy Policy."

64.     The Q1 2018 Form 10-Q stated the following, in pertinent part, regarding the Company's regulatory and legislative outlook and efforts:

The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. Management is taking steps to comply with these requirements, including increasing wind and solar installations and power purchases and broadening the AEP System's portfolio of energy efficiency programs.

\*          \*          \*

Federal and state legislation or regulations that mandate limits on the emission of CO2 could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs. Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities and could lead to possible impairment of assets.

65.     On May 3, 2018, American Electric released its 2018 Corporate Accountability Report (the "2018 CAR"). The 2018 CAR contained a message from defendant Akins stating that the Company was transitioning to a "cleaner energy future". In particular, he stated

At American Electric Power, we believe a sustainable future begins with the social and economic benefits of delivering universal access to safe, reliable and cost effective electricity every day. We are proud to have been entrusted with that responsibility and we work every day to deserve that trust. As we transition to a

cleaner energy future, we remain grounded in our commitment to working with our customers and communities to build a brighter, sustainable future together.

We're committed to creating the energy infrastructure and providing services needed to support vibrant communities. Beyond the sale and delivery of electrons, we are investing in education, helping people find programs and services to ensure a better life, collaborating with local and regional organizations to further support economic and business growth, increasing mobility in underserved neighborhoods, and supporting a host of cultural and community initiatives that are important to our customers. Our investments to create a modern, bi-directional, interconnected grid will build value for our communities in ways that we have yet to fully imagine.

We envision a future where smart systems allow us to power society in more efficient, effective ways and in ways customers expect. And that future is a lot closer than we think.

With electrification comes a responsibility to ensure the security, reliability and resilience of the grid. We are investing billions to replace aging infrastructure, making the system stronger so that when outages occur, we can restore service more quickly. We are also diversifying resources, enabling innovation, advancing technologies to plug into the grid, preparing for a digital future, planning strategically for our future workforce and reducing our environmental footprint along the way. In today's era of continuous disruption and change, energy is the common thread that bridges the past with the future.

66.     The 2018 CAR also claimed that the Company was "continu[ing] to advance new and innovative energy solutions, working with our customers, regulators and legislators to make the changes to support a modern and resilient grid."

67.     The 2018 CAR also contained a section supposedly describing the Company "[w]orking with [o]ur [r]egulators" that failed to discuss American Electric's illegal lobbying campaign.   In particular, the 2018 CAR stated:

Working with Our Regulators

2017 saw one of the busiest regulatory calendars in the history of the company. We had rate cases in various stages across five states, and made numerous filings at the Federal Energy Regulatory Commission (FERC), as did our stakeholders. The largest was the $4.5 billion Wind Catcher Energy Connection project, which required filings across four states and at FERC. And, there were numerous filings to support the expansion of renewable energy, energy efficiency, economic development and grid modernization.

- 33 -

Our regulatory case load reflects AEP's commitment to pursuing solutions that enhance the customer experience and embrace technologies that will improve our overall use of energy. To do so, we must remain financially strong to make the needed investments and to remain attractive to investors. Second, our caseload clearly reflects AEP's commitment to pursuing solutions that enhance the customer experience and embrace technologies that will improve our overall use of energy. In addition, we should expect to see more capital deployed for projects such as Wind Catcher and other grid optimization technologies that actually lower customer bills for our product.

68.     In the "Regulatory and Public Policy " section, the 2018 CAR stated:

The electric utility industry is one of the most highly regulated sectors of the U.S. economy. The industry is undergoing a major transformation to modernize the grid, making it more reliable, resilient and customer friendly. Through this evolution, we continue to work with our customers, regulators and policymakers at the federal, state and local levels.

In 11 states, AEP operates within a variety of jurisdictional regulatory frameworks. Those frameworks primarily are governed by state legislatures that direct state regulatory commissions to achieve overarching policy goals. These regulatory and legislative environments, in conjunction with federal regulation and legislation, define the parameters of AEP's business and planning models.

Our focus always is on a safe and reliable grid that is resilient and adaptive. Our generation, transmission and distribution system investments directly affect our customers and shareholders. These investments must coexist with regulation and policy considerations such as environmental rules and affordability. As we transition to a clean energy future, we are reshaping our asset base in a reliable and affordable manner for our customers while managing the financial risk for our shareholders. The changes we are making must be compatible with the regulatory frameworks in which we exist on the wires (transmission and distribution) side of the business.

However, regulatory frameworks must be responsive to today's technology and customer preference environment. AEP is at the forefront of evaluating and deploying technologies to improve the customer experience. Regulations must be progressive enough to allow the utility to provide these solutions for customers. The customer must be the center of our focus and analysis and regulatory policy decision-making.

*        *        *

**Public Policy and Issue Management**

Similar to other companies, AEP has a public policy strategy that seeks to influence decisions being made at Congress, FERC, state legislatures and regulatory

- 34 -

commissions. We do this to mitigate our risk exposure and to help us achieve our business objectives.

In 2017, AEP formed the Policy Advisory Team (PAT) to better manage public policy issues. This team is composed of senior executives across AEP, including some of those who represent the company in Washington, D.C., and the state capitals in our service territory.

The PAT considers policy options on issues of relevance to the company. The multi-departmental, cross-function structure of the PAT supports internal policy analysis and debate. The approach helps ensure that AEP is speaking with one voice on important public policy considerations and that all employees, and ultimately external stakeholders, are clear on our policy positions and objectives. The goal of the PAT is to ensure a smoother, more consistent policy strategy across the company.

In strategic discussions about how we can best align ourselves to maximize the customer benefits of new technologies, we talk about "future-proofing" our company. The pace and scope of change underway in the utility sector is indisputable. In order to adapt and bring the most value to customers, utilities require a regulatory and legislative framework that allows them the flexibility to incorporate new technologies, including those we've not even envisioned yet. We need a regulatory paradigm that fosters rapid deployment of creative energy solutions.

Currently, there are two models at play in this country – one in which the utility is transformed into a platform provider at the distribution level, effectively turning over the customer relationship to the energy market, rather than with the utility. This model is playing out in New York with its Reforming the Energy Vision (REV). The second model, which we believe is the better approach, is the utility as a platform that works in concert with the customer relationship and technology providers (e.g., charging stations). This important to ensure universal access for all customers to clean energy resources and new technologies and to provide the scope and scale that technology providers need – that a utility can offer – to accelerate environmental, operational and efficiency benefits from new technologies.

One example of the need for change is unfolding in Texas. In 2016, AEP Texas sought approval to install lithium-ion batteries on its distribution system in a rural area that experiences more outages, for longer periods of time, compared with the rest of the service territory. Battery installation would be a more cost-effective solution than traditional transmission and distribution upgrades.

In January 2018, Texas regulators rejected our request. However, they acknowledged that the docket raised important issues about the use of technology to cost-effectively address reliability. They agreed to open a separate rulemaking to develop a framework that takes these options into account. We support the commission's opening a rulemaking because it paves the way for the type of rule

changes we believe are needed to cost-effectively and efficiently use non-traditional technologies to solve reliability issues. But we also have to ask ourselves: "What about the customer? Do they have to wait longer for a solution? What do they do in the meantime?" We must center our decisions and timing on a framework that works for all customers.

Some commissions are becoming more curious. In 2017, the Public Utilities Commission of Ohio (PUCO) launched an initiative called PowerForward to study grid modernization in the state. The PUCO is focusing on new technologies and regulatory innovation that could benefit customers in the future while modernizing the grid. Through this process, the PUCO has acknowledged customers' desire for more technology and innovation in the electric sector, along with the need for a modern regulatory road map to make it happen. This is the type of structured stakeholder conversation that is needed to enable the paradigm shift to occur.

69.     On July 26, 2018, American Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q") with the SEC.  The Q2 2018 Form 10-Q discussed the Company's clean energy and regulatory efforts.  In particular, the Q2 2018 Form 10-Q stated:

AEP has taken action to reduce and offset $CO_2$ emissions from its generating fleet and expects $CO_2$ emissions from its operations to continue to decline due to the retirement of some of its coal-fired generation units, and actions taken to diversify the generation fleet and increase energy efficiency where there is regulatory support for such activities. The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions.  Management is taking steps to comply with these requirements, including increasing wind and solar installations, power purchases and broadening AEP System's portfolio of energy efficiency programs.

In February 2018, AEP announced new intermediate and long-term $CO_2$ emission reduction goals, based on the output of the company's integrated resource plans, which take into account economics, customer demand, grid reliability and resiliency, regulations and the company's current business strategy. The intermediate goal is a 60% reduction from 2000 $CO_2$ emission levels from AEP generating facilities by 2030; the long-term goal is an 80% reduction of $CO_2$ emissions from AEP generating facilities from 2000 levels by 2050. AEP's total projected $CO_2$ emissions in 2018 are approximately 90 million metric tons, a 46% reduction from AEP's 2000 $CO_2$ emissions of approximately 167 million metric tons.

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs,

which in turn, could lead to increased liquidity needs and higher financing costs.  Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities, which could possibly lead to impairment of assets.

70.     On October 25, 2018, American Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q").  The Q3 2018 Form 10-Q provided similar updates regarding the Company's clean energy and regulatory efforts.  In particular, the Q3 2018 Form 10-Q stated:

AEP has taken action to reduce and offset CO2 emissions from its generating fleet and expects CO2 emissions from its operations to continue to decline due to the retirement of some of its coal-fired generation units, and actions taken to diversify the generation fleet and increase energy efficiency where there is regulatory support for such activities. The majority of the states where AEP has generating facilities passed legislation establishing renewable energy, alternative energy and/or energy efficiency requirements that can assist in reducing carbon emissions. Management is taking steps to comply with these requirements, including increasing wind and solar installations, power purchases and broadening AEP System's portfolio of energy efficiency programs.

In February 2018, AEP announced new intermediate and long-term $CO_2$ emission reduction goals, based on the output of the company's integrated resource plans, which take into account economics, customer demand, grid reliability and resiliency, regulations and the company's current business strategy. The intermediate goal is a 60% reduction from 2000 $CO_2$ emission levels from AEP generating facilities by 2030; the long-term goal is an 80% reduction of $CO_2$ emissions from AEP generating facilities from 2000 levels by 2050. AEP's total projected $CO_2$ emissions in 2018 are approximately 90 million metric tons, a 46% reduction from AEP's 2000 $CO_2$ emissions of approximately 167 million metric tons.

Federal and state legislation or regulations that mandate limits on the emission of $CO_2$ could result in significant increases in capital expenditures and operating costs, which in turn, could lead to increased liquidity needs and higher financing costs.  Excessive costs to comply with future legislation or regulations might force AEP to close some coal-fired facilities, which could possibly lead to impairment of assets.

71.     On December 5, 2018, the Company issued a press release titled "AEP Announces Executive Leadership Changes." These "changes" were simply executives at American Electric rotating to different executive vice president positions.  However, defendant Akins used the press

- 37 -

release to continue defendants' claim that the Company had a "long-term strategy of investment in smart, cleaner energy infrastructure and innovative technological solutions for the benefit of our customers."

72.     On February 21, 2019, American Electric filed its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K") with the SEC.  Defendants Akins, Tierney, Buonaiuto, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, Notebaert, Nowell, Rasmussen, Richard, and Tucker signed the 2018 Form 10-K.  The 2018 Form 10-K stated that the Board is informed of any legislation that would significantly affect the Company.  It also stated that the Governance Committee oversees the annual corporate accountability report.  In particular, the 2018 Form 10-K stated:

> ***Corporate Governance***
>
> In response to environmental issues and in connection with its assessment of AEP's strategic plan, the Board of Directors continually reviews the risks posed by new environmental rules and requirements that could accelerate the retirement of coal-fired generation assets. The Board of Directors is informed of any new environmental regulations and proposed regulation or legislation that would significantly affect the company. The Board's Committee on Directors and Corporate Governance oversees the company's annual Corporate Accountability Report, which includes information about the company's environmental, social, governance and financial performance. In addition, as a result of ongoing corporate governance outreach efforts with shareholders, AEP set new $CO_2$ emission reduction goals that were published in a new report in February 2018, "American Electric Power: Strategic Vision for a Clean Energy Future."

73.     The 2018 Form 10-K also contained a section on "Regulation" affecting the Company.  There, it discussed that the Company was engaging state commissioners and legislators concerning ratemaking options.  In the state-by-state breakdown contained in this section, any discussion of Ohio is noticeably absent.  In particular, the 2018 Form 10-K stated:

> Public utilities have traditionally financed capital investments until the new asset is placed in service.  Provided the asset was found to be a prudent investment, it was then added to rate base and entitled to a return through rate recovery.  Given long lead times in construction, the high costs of plant and equipment and volatile capital

markets, management actively pursues strategies to accelerate rate recognition of investments and cash flow. AEP representatives continue to engage state commissioners and legislators on alternative ratemaking options to reduce regulatory lag and enhance certainty in the process. These options include pre-approvals, a return on construction work in progress, rider/trackers, formula rates and the inclusion of future test-year projections into rates.

74.     The 2018 Form 10-K also contained a discussion about the competition the Company faced, including competition subsidized or encouraged through regulation, which would harm the Company's fossil fuel-using energy plants.  In particular, the 2018 Form 10-K stated:

In the event that alternative generation resources are mandated, subsidized or encouraged through climate legislation or regulation or otherwise are economically competitive and added to the available generation supply, such resources could displace a higher marginal cost fossil plant, which could reduce the price at which market participants sell their electricity. These events could cause AGR to retire generating capacity prior to the end of its estimated useful life.

75.     On April 23, 2019, the Company issued a press release titled "AEP Investing to Deliver Smarter, Cleaner Energy to Customers, Shareholders Learn at Annual Meeting."  The press release touted the American Electric's performance and focused on its investments in renewable energy.  In particular, the press release quoted defendant Akins as stating:

"AEP continually delivers strong earnings and dividend growth driven by our investments in a smarter, cleaner energy system," Akins said. "Beyond our capital investments, our employees and their commitment to the customers and communities we serve drives the success of our company. Our talented workforce is focused on providing reliable, affordable and cleaner energy and new technologies to meet our customers' needs and expectations," Akins said.

76.     On April 26, 2019, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC.  In the "Regulatory Matters" section of the Q1 2019 Form 10-Q, defendants specifically discussed HB 6.  In particular, the Q1 2019 Form 10-Q stated:

The Ohio House of Representatives introduced a clean energy bill in April 2019, which would offer incentives for power-generating facilities with zero- or reduced carbon emissions.  The Ohio bill also proposes to eliminate the current energy efficiency and renewable mandates for Ohio electric utilities in order to pay for the

- 39 -

zero/reduced emission credits. Management is analyzing the impact of this new legislation but it could be significantly amended before passage and cannot, at this time, estimate the impact results on operations, cash flows or financial condition

77.     On May 9, 2019, American Electric issued a press release titled "AEP Releases 2019 Corporate Accountability Report." The press release focused on the Company's "sustainable development strategy." In particular, the press release stated:

> The report's theme, "Innovating for a Boundless Energy Future," mirrors AEP's efforts to embrace technology and digitization to deliver clean, reliable energy to its customers and value to its shareholders, while also being a positive force in the communities it serves.
>
> The report's theme, "Innovating for a Boundless Energy Future," mirrors AEP's efforts to embrace technology and digitization to deliver clean, reliable energy to its customers and value to its shareholders, while also being a positive force in the communities it serves.
>
> "At AEP, we see a future full of opportunities for our customers, employees, investors, communities and our company. To create this future, we must be increasingly innovative to develop cutting-edge solutions to complex problems. We must be agile and adaptable to leverage rapid, sometimes unpredictable, changes in technology. And we must nurture a diverse and engaged workforce that is clearly focused on delivering 21st century customer service as we further electrify our economy," said Nicholas K. Akins, AEP chairman, president and chief executive in the report's introduction.
>
> Four key principles of the company's sustainable development strategy – being a catalyst for change; supporting environmental stewardship; supporting strong local communities; and building a brighter energy future together with its customers – guide AEP as the company creates benchmarks and goals.

78.     Also, on May 9, 2019, American Electric issued its 2019 Corporate Accountability Report (the "2019 CAR"). The 2019 addressed the Company's clean energy efforts, as well as its outlook on the regulatory and legislative landscape. In particular the 2019 CAR stated:

**REGULATORY AND PUBLIC POLICY**

> AEP is committed to enhancing regulatory models to give utilities the ability to explore new and evolving solutions that deliver the best value for our customers.

*       *       *

**SUSTAINABILITY GOVERNANCE**

There is no one-size-fits-all approach to sustainability governance, but AEP believes it is fundamental to building and strengthening sustained business value. Good governance ensures transparency, fairness and accountability, and gives us a structured way to manage the challenges of a changing society.

*      *      *

**SUSTAINABILITY GOVERNANCE**

There is heightened demand for transparency and expectation that business leaders adopt holistic, long-term approaches to managing environment, social and governance (ESG) performance. Companies are judged on performance and how well they link tangibles (such as financial capital and physical assets) with intangibles (such as reputation, brand, customer loyalty, risk management, trust and credibility) and show bottom-line benefits.

There is no one-size-fits-all approach to sustainability governance, but AEP believes it is fundamental to building and strengthening sustained business value. Good governance ensures transparency, fairness and accountability, and gives us a structured way to manage the challenges of a changing society.

Through AEP's Enterprise Sustainability Council (ESC) – with oversight from executive management and the Committee on Directors and Corporate Governance of the Board of Directors – we have clear guidance on our ESG responsibilities for sustainable business development. ESC members, who represent all aspects of AEP's business, serve as strategic ambassadors, providing guidance and support to ensure the success of AEP's sustainable development strategy. They do this by enabling cross-functional integration of sustainability across the enterprise.

The ESC is also responsible for monitoring the progress of AEP's sustainability goals and the timely and accurate production of AEP's annual Corporate Accountability Report. In addition, the ESC helps increase internal and external stakeholder awareness of the relevance and value of sustainability to AEP's success. The ESC also provides a forum for sharing work, best practices and ideas, and identifying trends and emerging issues that could impact AEP financially or operationally.

Executive sponsors of the ESC include the Chairman, President and CEO; Executive Vice President, General Counsel and Corporate Secretary; and Executive Vice President of External Affairs.

In addition to the ESC, the Committee on Directors and Corporate Governance of the Board of Directors reviews the Corporate Accountability Report annually and actively monitors AEP's ESG performance. The Committee provides feedback and develops the Board Statement supporting AEP's commitment to sustainable business development and performance accountability. The combined governance from the Board of Directors and the ESC helps us ensure our disclosure undergoes a disciplined review and validation process.

While these issues are discussed by the Board of Directors throughout the year, we report to the Committee on our sustainability-related activities at least twice per year. In addition, the Lead Director of AEP's Board of Directors conducts annual outreach to engage with investors on important ESG and governance matters.

*        *        *

**Lobbying and Political Contributions**

The electric utility industry is undergoing a fundamental transformation driven by a number of factors, including new public policies. For the benefit of all stakeholders, we actively participate in the political process and in lobbying activities at the national, state and local levels.

The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates, where allowed by law.

Each year, AEP publicly discloses lobbying activities and political contributions. We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Directors' Committee on Directors and Corporate Governance.

We have been asked by stakeholders why we belong to some organizations whose positions may conflict with AEP's. In general, we believe it is better to be at the table and engaged in the discussion whether or not we are in total agreement. When we disagree, we voice our concerns and work to change the position. Sometimes we prevail, and sometimes we do not, but we strive to reach an appropriate position based on the facts available. In addition, many of our customers belong to these organizations, and this helps us better understand their concerns and needs.

We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.

## ETHICS AND COMPLIANCE

At AEP, we are committed to health, safety, financial, operational and environmental compliance while holding ourselves to a high standard of ethical conduct – always doing what is right.

AEP's Principles of Business Conduct places responsibility for acting legally and ethically with every individual – from the Board of Directors and management to employees on the front line. We want employees to speak up, ask questions and

report potential violations without fear of retaliation. Our culture supports the interests of both employees and AEP by maintaining a vigilant approach to practicing compliance and acting with integrity. We will continue to build a reputation of trust by holding people accountable and taking appropriate actions when necessary.

In 2018, we updated the Principles of Business Conduct to reflect our cultural transformation and to provide clear direction on our expectations. For example, we enhanced the section on social media to remind employees that they represent the company, even when off the job. We also added a section on our supplier diversity initiatives and highlighted the importance of sustainability and protection of personally identifiable information (PII). We rolled out mandatory training on the updated Principles to all employees. The training consists of evaluating several distinct scenarios in some of our higher-risk areas such as conflicts of interest, appropriate use of company assets, fraud, management of PII, intellectual property and insider information and trading.

The Committee on Directors and Corporate Governance of the Board oversees AEP's Corporate Compliance Program and receives regular reports from the Chief Compliance Officer.

Our Ethics & Compliance team (including our Chief Compliance Officer) met with employees across AEP in 2018 to raise awareness of our programming and conduct comprehensive work group culture assessments.

Starting in 2019, all employees will be required annually to complete a conflict of interest disclosure as part of their mandatory training. This new process of soliciting potential conflicts of interest will be centralized and documented electronically, allowing our Ethics & Compliance department to review and clear (or flag) conflicts as needed. Our intent is to share what we learn with employees and managers to continuously set clear expectations for ethical behavior.

AEP also offers a confidential 24/7 hotline that allows employees to report concerns anonymously or to seek guidance on ethical, safety or compliance matters. Additionally, we created a quarterly "Ethics Hotspot" feature for managers and supervisors to use while engaging employees on these issues. These "Hotspots" demonstrate what is acceptable or unacceptable conduct and the associated consequences that come with it.

Our Ethics & Compliance team, with input from Human Resources and Legal, identified areas where we could improve training. For example, we will begin rolling out a new Sexual Harassment Prevention Workshop for managers in 2019. We want everyone who works for us to know that abuse of any kind is not only offensive but a violation of company policy and won't be tolerated. We are committed to providing a work environment that is free from intimidation and harassment.

As our business makes the transition to a clean energy future, we want to be more closely connected with our customers and to be a good corporate citizen. It is important to us that our employees are engaged members of their communities because they carry AEP's reputation with them wherever they go. We strongly urge our employees to uphold our values beyond the workplace by always acting with integrity.

79.     On July 25, 2019, American Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  Regarding HB 6, the Q2 2019 Form 10-Q stated:

In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero- or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency and renewable mandates after 2020 and 2026, respectively.  The bill also provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032 and includes a provision for recovery of certain legacy generation resources which will be allocated to all electric distribution utilities on a non-bypassable basis.  Management is analyzing the impact of this legislation and at this time cannot estimate the impact on results of operations, cash flows or financial condition.

80.     On September 10, 2019, American Electric issued a press release titled "AEP Accelerates Carbon Dioxide Emissions Reduction Target."  The press release focused on the Company's efforts to reduce its carbon emissions.  In particular, the press release stated:

COLUMBUS, Ohio, Sept. 10, 2019 - American Electric Power (NYSE: AEP) is cutting carbon dioxide emissions faster than anticipated and has revised its 2030 reduction target to 70 percent from 2000 levels. The company's previous target was a 60 percent reduction from 2000 levels by 2030.

AEP also is confident that it will cut carbon dioxide emissions by more than 80 percent from 2000 levels by 2050.

"AEP's overall strategy is focused on modernizing the power grid, expanding renewable energy resources and delivering reliable energy to our customers. Our transition to a cleaner, more balanced resource mix helps mitigate risk for our customers and shareholders alike and will ensure a more resilient and reliable energy system into the future," said Nicholas K. Akins, AEP chairman, president and chief executive officer.

"We've made significant progress in reducing carbon dioxide emissions from our power generation fleet and expect our emissions to continue to decline. Our

- 44 -

aspirational emissions goal is zero emissions by 2050. Technological advances, including energy storage, will determine how quickly we can achieve zero emissions while continuing to provide reliable, affordable power for customers," Akins said.

AEP will achieve future carbon dioxide emissions reductions through a variety of actions including investments in renewable generation, investments in transmission and distribution technologies to enhance efficiency, and expanded demand response and energy efficiency programs.

AEP's resource plans include adding more than 8,600 megawatts (MW) of new wind and solar generation to serve the company's regulated utility customers by 2030. The company currently is seeking regulatory approval to add 1,485 megawatts of new wind generation to serve customers in Arkansas, Louisiana, Oklahoma and Texas.

AEP also is investing in renewable energy in competitive markets. Between 2019 and 2023, the company plans to invest approximately $2.2 billion in contracted renewables and renewables integrated with energy storage. AEP already added 1,302 megawatts of contracted renewables to its portfolio this year.

To enhance the efficiency and resiliency of the energy delivery system, AEP's long-term strategy includes plans to invest approximately $25 billion over the next 5 years in its transmission and distribution systems.

AEP has factored future carbon regulations into the company's evaluation of generation resource options for many years and will continue to do so. The company already has cut its carbon dioxide emissions by 59 percent since 2000.

AEP's generation capacity has gone from 70 percent coal-fueled in 2005 to 45 percent today. Its natural gas capacity increased from 19 percent in 2005 to 28 percent today, and its renewable generation capacity has increased from 4 percent in 2005 to 17 percent today.

81. On September 16, 2019, American Electric issued an alert titled "Regulatory News:

What's Going on with PJM's BRA and House Bill 6?" It stated:

**What is Ohio's HB 6?**

When initially introduced, the purpose of the legislation was for all Ohio electricity customers to pay to keep open Lake County's Perry and Ottawa County's Davis-Besse nuclear plants, owned by FirstEnergy Solutions (FES), a subsidiary of FirstEnergy Corp. However, ***the goal of the legislation expanded to support additional renewable energy resources while eliminating certain utility energy efficiency activities and renewable portfolio compliance standards***. The expansion to HB 6 came with the expectation that distribution charges would be

reduced by eliminating the energy efficiency rider charge while promoting clean air resources.

On July 24, 2019, Ohio Governor Mike DeWine signed into law HB 6. This law creates the Nuclear Generation Fund and the Renewable Generation Fund, to be administered by the Ohio Air Quality Development Authority. These funds allow for a "qualifying nuclear resource" or a "qualifying renewable resource" to be eligible for participation in the programs for one or more program years, as determined by the Authority.

**What's included in HB 6?**

HB 6 essentially contains five main provisions.

1. Establishes a Clean Air Fund to subsidize two nuclear power plants.
2. Renewable Funding Opportunity, which supports pre-qualified solar projects certificated before June 2019.
3. Ohio Valley Electric Corporation (OVEC) Statewide Recovery Charge, subsidizing two coal-fired power plants.
4. Reduced Renewable Portfolio Standards (RPS) required by electricity suppliers.
5. Energy efficiency programs offered by utilities end December 2020.

**What are the details of each provision in HB 6?**

\*      \*      \*

***Renewable Funding Opportunity***

HB 6 supports eligible solar facilities over 50MW that already have siting certification as of June 2019. ***AEP Ohio has two eligible solar renewable facilities located in Highland County.*** These are the Willowbrook project (100MW) and the Hecate project (300MW).

Through the renewable funding opportunity, a $9 per MWh credit is paid to project owners of eligible solar facilities for a total of $20 million annually, which covers about 1,000MW of solar. This credit is assessed from the $20 million renewable portion of the Clean Air Fund as described above.

***OVEC Statewide Recovery***

The Ohio Valley Electric Corporation (OVEC) and the Indiana-Kentucky Electric Corporation (IKEC) are generating stations originally built in the 1950s and provided electric power for the U.S. Department of Energy's uranium enrichment facilities then near Portsmouth, Ohio. Today, OVEC and IKEC own two coal power plants; Kyger Creek Generating Station (1.1GW) in Cheshire, Ohio and Clifty Creek Generating Station (1.3GW) in Madison, Indiana. Under HB 6, OVEC and IKEC will receive subsidies to support their coal-fired power plants.

Effective January 1, 2020, distribution customers throughout Ohio will incur a non-bypassable charge, called the Purchased Power Agreement (PPA) Rider. The rider for residential customers is $1.50 per month. Commercial and industrial customers' monthly charge is $1,500 for this rider. The PPA Rider will begin in 2021 and will be reviewed by the Commission every three years to determine continuation of the rider, which is to end December 31, 2030.

### Reduced Renewable Portfolio Standards

In 2008, the State of Ohio established their Renewable Portfolio Standards (RPS) policy. This policy required providers selling electricity to consumers to provide a specific percentage of that supply from renewable sources. Currently, the RPS policy states 12.5% of your electricity must come from renewable energy sources by 2027, with 0.5% required to be solar.

HB 6 reduces the RPS target for utilities and competitive retail energy suppliers to 8.5%, and the solar portion is eliminated by December 31, 2026. This means that most Ohio customers will see a price reduction by the elimination of RPS requirements effective January 1, 2027. However, an AEP Ohio customer should read the section below on the AEP Ohio bypassable renewable legacy charge, as you will continue to receive this charge through 2032.

82.    It also discussed an effort to add a referendum on the November 2020 ballot to

repeal HB 6. In particular, it stated:

### Potential Referendum on Ohio HB 6

Groups are forming a campaign to add a referendum on the November 2020 ballot to repeal HB 6. Opponents include environmental groups opposed to the elimination of energy efficiency programs and developers of natural gas-fired power plants opposed to the subsidy for nuclear generation. These groups are circulating a petition, seeking 1,000 signatures from registered Ohio voters in hopes of adding a referendum to the 2020 election.

The petition was approved by the Ohio Attorney General David Yost on August 29, 2019. The next step opponents will take is to obtain approximately 266,000 additional signatures to place the petition on the November 2020 ballot for a vote. Finally, a majority vote is needed to approve the petition for the repeal of HB 6.

Meanwhile FES filed a challenge to the petition with the Supreme Court of Ohio on September 4, stating HB 6 is a tax and tax laws are exempt from referendums.

This petition process will take a long time before being resolved and may create market uncertainty for everyone at each step of the process. This uncertainty may impact energy supply plans and strategies for all involved.

83.     On October 24, 2019, American Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2019 (the "Q3 2019 Form 10-Q") with the SEC.  The Q3 2019 Form 10-Q also addressed HB 6, stating:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency and renewable mandates no later than 2020 and after 2026, respectively.  The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032. The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis.  OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

84.     On February 20, 2020, American Electric filed its Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Form 10-K") with the SEC.  Defendants Akins, Tierney, Buonaiuto, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker signed the 2019 Form 10-K.  The 2019 Form 10-K discussed HB 6, stating:

> In January 2020, provisions enacted as part of Ohio Am. Sub. H.B. 6 went into effect that replace the PPA rider and enable OPCo to continue recovering the net cost associated with the ICPA, including any additional contractual entitlement received as a result of the FirstEnergy Solutions (FES) bankruptcy, through 2030.

85.     On May 6, 2020, American Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2020 (the "Q1 2020 Form 10-Q") with the SEC.  The Q1 2020 Form 10-Q stated the following regarding HB 6:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor.  The clean energy legislation phases out current energy efficiency including lost shared savings revenues of $26 million annually and renewable mandates no later than 2020 and after 2026, respectively.  The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through

2032. The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis. OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

86.     On May 20, 2020, American Electric released its 2020 Corporate Accountability Report (the "2020 CAR"). The 2020 CAR highlighted the Company's supposed efforts for sustainable energy, as well as its lobbying, compliance, and regulatory efforts. In particular, the 2020 CAR stated:

> At AEP, we never have been more certain of our responsibility to a sustainable future for our customers, communities and employees. We will continue to take steps to reduce our carbon footprint, to empower customers and to value and develop our workforce.
>
> *       *       *
>
> **CLEAN ENERGY FUTURE**
>
> AEP's transition to a clean energy future is well underway. From diversifying our resource portfolio to modernizing the grid, we are at the forefront of this transformation.
>
> *       *       *
>
> **Public Policy & Issue Management**
>
> Similar to other companies, AEP has a public policy strategy that seeks to inform decisions made by Congress, the Federal Energy Regulatory Commission (FERC), North American Electric Reliability Corporation (NERC), state legislatures and regulatory commissions, and Regional Transmission Organizations (RTOs).
>
> AEP's Policy Advisory Team (PAT), consisting of senior executives across all business functions and departments, considers policy options on issues of relevance to the company and supports internal policy analysis and debate. This approach ensures that AEP is speaking with one voice and that all employees with external contacts are clear on our policy positions and objectives. Since its inception in May 2017, the PAT has reviewed more than two dozen issues, including 13 in 2019.
>
> **Climate & Lobbying**
>
> Some stakeholders are asking AEP whether our lobbying practices and the policy positions taken by trade organizations to which we belong are in alignment with

the Paris Climate Agreement. ***We believe in transparency and active participation in public policy development, regardless of the issue or position.*** Moreover, AEP is a respected and sought-after voice when it comes to energy policy-related matters in the U.S.

We report on our public policy positions, annual lobbying and political contributions, policy on political contributions and trade association memberships. We post our lobbying policy online and have consistently acknowledged our intent to participate actively in the political process and in lobbying activities at the national, state and local levels. At AEP, we must consider a number of factors when engaging in this arena, as public policy develops through negotiation and compromise. While many divergent issues are of importance to us, we cannot invest all of our efforts to focus on a single issue. We are obligated to deliver safe, reliable, affordable and secure electricity to all of our customers, and we develop our public policy positions with that in mind.

## THE TRUTH EMERGES

87.     The truth behind the Company's business dealings and Individual Defendants' wrongdoing began to emerge on July 25, 2020, when the *Columbus Dispatch* published an article titled "Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign," revealing that American Electric played a direct role in funding the dark money at the center of the HB 6 scandal.

88.     On this news, American Electric's market capitalization plunged more than $2.3 billion or $4.79 per share, erasing over 5% of the Company's market capitalization, on a single day.

89.     On August 20, 2020, investors in American Electric brought a class action against the Company, defendants Akins, Tierney, and Buonaiuto in the U.S. District Court for the Southern District of Ohio for securities fraud.

## REASONS THE STATEMENTS WERE IMPROPER

90.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company had participated in a large and organized bribery and corruption conspiracy, pursuant to which money was secretly funneled to Ohio political organizations and politicians in order to entice these individuals and groups to support the passage of HB 6;

(b)    the Company secretly funded a misleading advertising campaign and supported other efforts focused on thwarting the proposed referendum to repeal HB 6;

(c)    the Company was not committed to clean energy, but rather, supported (through illegal means) HB 6 and the efforts to prevent a repeal of HB 6, so that the Company's dirty energy producing assets would remain in operation; and

(d)    the Company was not concerned with protecting its customers' interests, as shown by its support of a supposedly unchallengeable state-mandated surcharge on customer bills made possible through the illegal campaign described herein.

### DAMAGES TO AMERICAN ELECTRIC

91.    As a result of the Individual Defendants' improprieties, American Electric disseminated improper, public statements.  These improper statements have devastated American Electric's credibility as reflected by the Company's almost $10 billion, or nearly 20%, market capitalization loss when its stock price from its relevant period high of $104.33 per share to $83.26 after the truth was revealed.

92.    American Electric's performance issues also damaged its reputation within the political and business community, as well as among its ratepayers. Each of these groups will consider the Company's now diminished reputation for transparently disclosing its lobbying activities and devotion to clean energy.  American Electric's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher

marginal costs of capital and debt because the improper statements and misleading lobbying activities have materially increased the perceived risks of investing in and lending money to the Company.

93. Further, as a direct and proximate result of the Individual Defendants' actions, American Electric has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(b) costs incurred from responding to any government investigations;

(c) amounts spent donating to the dark money lobbying organizations that violated the law; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to American Electric.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

94. Plaintiff brings this action derivatively in the right and for the benefit of American Electric to redress injuries suffered, and to be suffered, by American Electric as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. American Electric is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95. Plaintiff will adequately and fairly represent the interests of American Electric in enforcing and prosecuting its rights.

96. Plaintiff was a stockholder of American Electric at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current American Electric stockholder.

97. The current Board of American Electric consists of the following fourteen individuals: defendants Akins, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, McCarthy, Notebaert, Rasmussen, Richard, Tucker, and nondefendants Art A. Garcia and Daryl Roberts. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

98. As alleged above, defendants Akins, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, McCarthy, Notebaert, Rasmussen, Richard, and Tucker breached their fiduciary duties of loyalty by making improper statements in the Company's public statements and SEC filings.

99. Defendants Hoaglin, Lin, Notebaert, Rasmussen, and Tucker are all members of the Governance Committee. These defendants, as members of the Governance Committee, were responsible for overseeing the misleading corporate accountability reports and the Company's lobbying activities. The Governance Committee was also responsible for the implementation of the Company's corporate compliance program, which included the development of programs of legal compliance. Nevertheless, defendants Hoaglin, Lin, Notebaert, Rasmussen, and Tucker approved the misleading corporate accountability reports and, as shown by their responsibilities in overseeing the reports' lobbying disclosures, knew and at a minimum allowed the Company's contributions to the dark money lobbying groups. Accordingly, defendants Hoaglin, Lin, Notebaert, Rasmussen, and Tucker face a substantial likelihood of liability.

100.     Defendants Anderson, Beasley, Goodspeed, Hoaglin, Lin, McCarthy, and Tucker, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with reporting, legal, and regulatory requirements.  The Audit Committee was also responsible for overseeing the major enterprise risks facing the Company and assuring that all such risks are communicated to the Board.  Thus, these defendants were responsible for knowingly or recklessly allowing the improper statements.  Moreover, defendants Anderson, Beasley, Goodspeed, Hoaglin, Lin, McCarthy, and Tucker reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, these defendants caused the improper statements.  Accordingly, defendants Anderson, Beasley, Goodspeed, Hoaglin, Lin, McCarthy, and Tucker breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, defendants Anderson, Beasley, Goodspeed, Hoaglin, Lin, McCarthy, and Tucker face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

101.     Defendants Akins, Anderson, Beasley, Crosby, Goodspeed, Hoaglin, Lin, McCarthy, Notebaert, Rasmussen, Richard, and Tucker were all members of the Policy Committee.  The members of the Policy Committee were required to examine the Company's policies on major public issues affecting the Company.  As a result, the Policy Committee necessarily closely followed HB 6 and discussed the Company's approach the proposed referendum seeking to have it overturned, including its lobbying efforts.

102.     Pursuant to its Charter, the "Policy Committee [is] responsible for examining the Company's policies on major public issues affecting the Company and its subsidiaries, including environmental, industry change and other matters, as well as established policies that affect the

relationship of the Company and its subsidiaries to their service areas and the general public." Further, the Policy Committee was responsible for reporting to the Board about the environmental, industry, and policy matters.  Accordingly, the members of the Policy Committee knew that the Company was providing lobbying money to dark money organizations supporting HB 6 and that this bill supported "dirty" energy projects, including American Electric's coal plants.  Accordingly, the members of the Policy Committee face a substantial likelihood of liability.

103.    Plaintiff has not made any demand on the other stockholders of American Electric to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    American Electric is a publicly held company with almost 500 million shares outstanding and thousands of stockholders as of  October 22, 2020;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Individual Defendants owed and owe American Electric fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe American Electric the highest obligation of care and loyalty.

- 55 -

106.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

107.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, American Electric has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

108.    Plaintiff, on behalf of American Electric, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    As a result of the wrongdoing described herein, the Individual Defendants have caused American Electric to waste its assets by supporting dark money lobbying organizations and paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

111.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

112.    Plaintiff, on behalf of American Electric, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of American Electric. The Individual Defendants

were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to American Electric.

115.    Plaintiff, as a stockholder and representative of American Electric, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

116.    Plaintiff, on behalf of American Electric, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of American Electric, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing American Electric to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect American Electric and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to prohibit the Company from providing support, monetary or otherwise, to any dark money lobbying organizations;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a provision to permit the stockholders of American Electric to nominate at least three candidates for election to the Board; and

4. a proposal to strengthen American Electric's oversight of its disclosure procedures;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of American Electric has an effective remedy;

D. Awarding to American Electric restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

*/s/ John C. Camillus*
**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
(614) 992-1000
jcamillus@camilluslaw.com

ROBBINS LLP
BRIAN J. ROBBINS (pro hac vice forthcoming)
CRAIG W. SMITH (pro hac vice forthcoming)
SHANE P. SANDERS (pro hac vice forthcoming)
EMILY R. BISHOP (pro hac vice forthcoming)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990

- 58 -

Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
 csmith@robbinsllp.com
 ssanders@robbinsllp.com
 ebishop@robbinsllp.com

BARR LAW GROUP
LEONID KANDINOV (pro hac vice forthcoming)
501 W Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4966
Facsimile: (619) 400-4810
E-mail: leo@barrlaw.com

Attorneys for Plaintiff

1503201