**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| IN RE AEP STOCKHOLDER DERIVATIVE LITIGATION | Master File No. 2:21-cv-00163 |
| | Judge Sarah D. Morrison |

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Esther Kogus and Robert L. Reese ("Plaintiffs"), by and through their undersigned attorneys, bring this shareholder derivative action for the benefit of nominal defendant American Electric Power Company, Inc. ("AEP" or the "Company") against the Company's Board of Directors (the "Board") and certain of its executive officers, seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and insider trading. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel and a review of publicly available information, including filings by AEP with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I. NATURE AND SUMMARY OF THE ACTION

1. AEP is an electric public utility holding company that generates, transmits, and distributes electricity. Approximately 30% of its customers are in Ohio, and approximately 30% of the energy AEP generates in Ohio stems from two coal-fired plants that the Company owns through a consortium with other utility companies.

2. In July 2019, Ohio passed a bill that would provide a $1.3 billion ratepayer-funded bailout of these two plants. Throughout the period in which the bill was crafted and considered by the Ohio legislature, AEP clandestinely orchestrated the bill's passage by funding the campaign for Ohio House Speaker, Larry Householder ("Householder"), in return for the bailout for the Company's plants.

3. On July 21, 2020, a criminal complaint and supporting affidavit were unsealed, revealing that utility companies had bribed Householder with more than $60 million to secure the passage of the bailout and had concealed the payments through 501(c)(4) organizations called Generation Now and Energy Pass-Through. While utility companies were not named in the

complaint, corroborating information in the public record indicates that FirstEnergy Corp. and AEP made the improper payments. Once the bill had passed, these entities also undermined efforts to add a referendum on the ballot to repeal the bill, which was widely unpopular among Ohio ratepayers. Since that time, Generation Now and two Householder associates have pled guilty to racketeering charges and admitted that Generation Now was formed for the express purpose of receiving undisclosed donations "in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear plants in Ohio." Householder's trial is currently set for January 2023.

4. On July 26, 2020, *Columbus Dispatch* published an article revealing that AEP had contributed $350,000 toward the bribery scheme and that the funds had been directed through Empowering Ohio's Economy, Inc. ("EOE"), a non-profit operated solely with AEP funds, and Coalition for Opportunity & Growth.

5. On this news, the Company's share price fell $4.67 per share, or over 5%, to close at $81.16 per share on July 27, 2020, on unusually heavy trading volume.

6. On December 2, 2020, *Dayton Daily News* reported that AEP had contributed $900,000 to the groups at the center of the scandal, including $550,000 in 2019 alone.

7. On August 25, 2020, plaintiff Reese served on AEP a demand pursuant to N.Y. B.C.L. § 624 (the "Demand") seeking to inspect Board documents related to director oversight and/or knowledge of the political contributions. Following negotiations and entry into a confidentiality agreement, the Company produced approximately 540 pages of internal documents. Based on the information produced in response to the Demand and in the public record, Plaintiffs did not make a demand on AEP's Board prior to filing suit because a demand would be a futile

and useless act, as a majority of the director defendants face a substantial likelihood of liability for breaching their fiduciary duties.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between Plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court in accordance with 28 U.S.C. §§ 1391 and 1401 because: (i) American Electric maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to American Electric, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III. **PARTIES**

**Plaintiffs**

11.     Plaintiff Esther Kogus was a shareholder of AEP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current AEP shareholder.  She is a citizen of California.

12.     Plaintiff Robert L. Reese was a shareholder of AEP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current AEP shareholder.  He is a citizen of Pennsylvania.

**Nominal Defendant**

13.     Nominal defendant AEP is a New York corporation with its principal executive offices located at 1 Riverside Plaza, Columbus, Ohio 43215.  The Company's common stock trades on the NASDAQ exchange under the symbol "AEP."

**Defendants**

14.     Defendant Nicholas K. Akins ("Akins") has served as Chief Executive Officer ("CEO") of the Company since November 2011, President since January 2011, Chairman of the Board since January 2014, and a director since October 2011.  He has also served as Chairman and CEO of all of AEP's major subsidiaries.  He is Chair of the Executive Committee and a member of the Policy Committee.  Defendant Akins is a citizen of Ohio.

15.     Defendant Brian X. Tierney ("Tierney") served as Chief Financial Officer ("CFO") of the Company from October 2009 until January 2021, when he became AEP's Executive Vice President, Strategy.  Defendant Tierney is a citizen of Ohio.

16.     Defendant Thomas E. Hoaglin ("Hoaglin") has served as a director since 2008, and as AEP's Lead Director from April 2012 until at least March 2021.  He is Chair of the Directors

and Corporate Governance Committee ("Governance Committee") and a member of the Audit, Policy, and Executive Committees. Defendant Hoaglin is a citizen of Ohio.

17.     Defendant David J. Anderson ("Anderson") has served as a director of the Company since 2011. He is Chair of the Audit Committee and a member of the Executive, Finance, and Policy Committees. Defendant Anderson is a citizen of Massachusetts.

18.     Defendant J. Barnie Beasley, Jr. ("Beasley") has served as a director of the Company since 2014. He is Chair of the Nuclear Oversight Committee and a member of the Human Resources and Policy Committees. Defendant Beasley is a citizen of Georgia.

19.     Defendant Ralph D. Crosby, Jr. ("Crosby") served as a director of the Company from 2006 to April 2021. He is Chair of the Human Resources Committee and a member of the Executive, Nuclear Oversight, and Policy Committees. Defendant Crosby is a citizen of Virginia.

20.     Defendant Art A. Garcia ("Garcia") has served as a director of the Company since 2019. He is Chair of the Finance Committee and a member of the Audit, Governance, and Policy Committees. Defendant Garcia is a citizen of Florida.

21.     Defendant Linda A. Goodspeed ("Goodspeed") has served as a director of the Company since 2005. She is a member of the Audit, Policy, and Nuclear Oversight Committees. Defendant Goodspeed is a citizen of Florida.

22.     Defendant Sandra Beach Lin ("Lin") has served as a director of the Company since 2012. She is a member of the Audit, Governance, and Policy Committees. Defendant Lin is a citizen of Texas.

23.     Defendant Margaret M. McCarthy ("McCarthy") has served as a director of the Company since 2019. She is a member of the Audit, Policy, and Nuclear Oversight Committees. Defendant McCarthy is a citizen of Massachusetts.

24. Defendant Richard C. Notebaert ("Notebaert") served as a director of the Company from 2011 to April 2021. He is a member of the Governance, Policy, Finance, and Human Resources Committees. Defendant Notebaert is a citizen of Florida.

25. Defendant Lionel L. Nowell III ("Nowell") served as a director of the Company from 2004 to April 2020. He is a member of the Governance, Policy, and Finance Committees. Defendant Nowell is a citizen of Florida.

26. Defendant Stephen S. Rasmussen ("Rasmussen") served as a director of the Company from 2012 to February 2022. He was a member of the Governance, Policy, Finance, and Human Resources Committees. Defendant Rasmussen is a citizen of Iowa.

27. Defendant Oliver G. Richard, III ("Richard") has served as a director of the Company since 2013. He is Chair of the Policy Committee and a member of the Human Resources and Nuclear Oversight Committees. Defendant Richard is a citizen of Louisiana.

28. Defendant Sara Martinez Tucker ("Tucker") has served as a director of the Company since 2009. She is a member of the Governance, Policy, and Human Resources Committees. Defendant Tucker is a citizen of Texas.

29. Defendants Akins, Tierney, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Party**

30. Daryl Roberts ("Roberts") has served as a director of the Company since December 2020.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

31.    By reason of their positions as officers, directors, and/or fiduciaries of AEP and because of their ability to control the business and corporate affairs of AEP, at all relevant times, the Individual Defendants owed AEP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage AEP in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of AEP and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to AEP and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of AEP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with AEP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

33.    To discharge their duties, the officers and directors of AEP were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of AEP were required to, among other things:

> (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.      Governance Committee Charter**

34.     The Governance Committee is responsible for, among other things, developing a set of corporate governance principles applicable to AEP and "[o]therwise taking a leadership role in shaping the corporate governance of the corporation."

35.     The committee's charter provides certain "functions [which] shall be the common recurring activities of the Committee in carrying out its responsibilities." In relevant part, the charter lists the following:

C.      <u>Corporate Governance</u>

\*       \*       \*

4. Oversee on a continuing basis the implementation of the AEP Corporate Compliance Program, including reporting by the chief compliance officer, the development of specific programs of legal compliance in various important areas of concern to the operation of AEP System companies, and the designation of successor chief compliance officers.

\*       \*       \*

6. Oversee the Company's Sustainability Report, ***including the portion of the report that relates to the Company's political contributions***

### C. Audit Committee Charter

36. The Audit Committee is responsible for the "[t]he quality and integrity of the Company's financial statements" and "[t]he company's process for identifying and managing major risks, including strategic, operational, and financial risks."

37. The Audit Committee's charter also lists "functions [which] shall be the common recurring activities of the Committee in carrying out its responsibilities." In particular, the Audit Committee must "[o]versee the process of identifying major enterprise risks, including strategic, operational, and financial risks, and assure that all such risks are communicated to the Board for assignment of oversight among the Board and its Committees."

### D. Policy Committee Charter

38. The Policy Committee is "responsible for examining the Company's policies on major public issues affecting the Company and its subsidiaries, including environmental, industry change and other matters, as well as established policies that affect the relationship of the Committee and its subsidiaries to their service areas and the general public." The committee's charter further provides that members should "[c]ounsel the Chief Executive Officer and other members of management on any policy matters presented to the Committee for its consideration and study."

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. AEP's Operations

39. AEP is an electric utility holding company that generates, transmits, and distributes electricity. Its subsidiary, Ohio Power Co. ("OPCo"), is registered as AEP Ohio and transmits and distributes electricity to nearly 1.5 million retail customers in Ohio, which is roughly 30% of the Company's total customers.

40. Approximately 30% of the energy AEP generates in Ohio comes from two coal-fired plants, Kyger Creek (in Cheshire, Ohio) and Clifty Creek (in Madison, Indiana). The plants are owned by Ohio Valley Electric Corporation ("OVEC"), a consortium of utility companies including AEP and FirstEnergy Corp. According to the Inter-Company Power Agreement ("ICPA"), the sponsoring companies are entitled to receive and are obligated to pay for all OVEC capacity in proportion to their power participation ratio. AEP owns 43.47% of OVEC, the largest stake among the owners.

41. Coal-fired plants are subject to strict environment compliance requirements from the U.S. Environmental Protection Agency ("EPA"), North American Reliability Corporation ("NERC"), and state public utility laws, among others. Adhering to these requirements is costly. For example, defendant Akins noted in July 2019 that AEP has "invested nearly $9 billion in capital since 2000 to drastically cut emissions from our coal-fueled power plants."

42. Moreover, OVEC coal plants have been selling electricity for less than the cost to generate since 2012. As a result, and due to the compliance requirements, OVEC had approximately $1.3 billion of debt and only $3 million in net income for fiscal 2019.

### 2. The Passage of HB6 and the Related Criminal Convictions

43. In July 2019, Ohio passed House Bill 6 ("HB6"), which provided a $1.3 billion ratepayer-funded bailout to the power plants owned by OVEC. HB 6 enacted a monthly fee ($0.85 for residential customers and $2,400 for major industrial plants) for payments to the failing power plants. The bill also removed incentives for solar and wind projects and eliminated programs that helped residents use less power through energy-saving appliances or upgraded systems.

44. HB6 was widely unpopular. A campaign was launched to add a referendum on the bill in the 2020 election to remove it.

45. On July 21, 2020, a criminal complaint and supporting affidavit were unsealed, detailing an elaborate bribery scheme in which certain utility companies paid $60 million to Ohio House Speaker Householder, which was funneled through 501(c)(4) organizations called "Generation Now" and "Energy Pass-Through." Householder secretly controlled Generation Now and used these funds to pay his campaign staff and the campaigns of 21 other state candidates in the 2018 primary and general elections. Once he became House Speaker, Householder secured the passage of HB 6 in return for the utility companies.

46. Ohioans for Energy Security, another group supported by the payments, financed advertisements to undermine the referendum efforts, including ones warning Ohioans that the Chinese would take over the state's energy grid if the bailout was repealed. Generation Now also hired top signature collection firms to thwart the repeal efforts and prevent them from gathering the signatures necessary to put the proposed referendum on the ballot.

47. Householder's associates, Jeff Longstreth ("Longstreth) and Juan Cespedes ("Cespedes"), pled guilty to violations of Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy and face up to 20 years in prison and fines up to $250,000. As part of the plea agreement, Longstreth admitted to participating in the organization and management of Generation Now "as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of Representatives." And in a separate statement of facts, Cespedes admitted to his participation in a larger conspiracy to obtain Generation Now donations "in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear plants in Ohio" and to block the ballot campaign to overturn the $1 billion bailout for the plants in HB6.

48.     On January 29, 2021, Generation Now pled guilty to one count of racketeering for its role, agreeing to a term of not more than 5 years' probation, fines up to $250,000, fees, and the forfeiture of bank accounts with balances exceeding $1.5 million.  Generation Now admitted that it was created for the express purpose "to be used as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of Representatives."  *See* Plea Agreement, *United States v. Generation Now*, No. 1:20-CR-00077-TSB (S.D. Ohio Feb. 5, 2021).  In return for the funds, the companies would benefit from "specific official action [regarding] legislation that would go into effect and save the operation of two nuclear power plants in Ohio."  *Id.*

### B.     The Individual Defendants Knew of AEP's Involvement in the Householder Criminal Enterprise

49.     Between 2017 and 2019, AEP donated at least $900,000 through its non-profit, Empowering Ohio's Economy ("EOE"), to Generation Now and Coalition for Growth & Opportunity, which are directly linked to Householder and his associates.  AEP was the sole contributor to EOE.  As alleged herein, EOE was used as a smoke screen for the Company to divert funds to finance the passage of HB6 while concealing AEP's involvement in the bribery scheme.

#### 1.     AEP's Executives Worked Directly with Householder's Enterprise to Shape HB6

50.     HB6 was a priority for AEP.  Not only did the bill generate about $50 million annually to subsidize the two coal-fired plants, it would also avoid repeating the financial calamity from 2016 when AEP was forced to record a $2.3 billion impairment charge because of "a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio."  According to an email exchange between AEP's in-house counsel and a consultant for Householder's policy advisor, "avoid[ing] any impairment for the Company [was] a critical component" of HB6:

This proposal creates a regulatory asset – to be recovered as a distribution expense through subsequent rate cases only if the clean air fund does not fully reimburse the Company. So there is no new nonbypassable charge and no immediate rate impact (beyond eliminating our current bypassable AER charge). ***This approach avoids any impairment for the Company – which is a critical component for the Company as we discussed last week….***

51.     Several AEP executives were closely involved in the passage of HB6. Tom Froehle ("Froehle"), the Vice President of External Affairs of AEP and AEP's top lobbyist, served as a director of EOE and thus knew of the use of funds that AEP had contributed to the non-profit. Froehle simultaneously advocated for AEP's interests in the passage of HB6. For example, he sent an email to the Ohio House of Representatives on May 22, 2019 stating that "American Electric Power – Ohio supports House Bill 6" and that "[t]his bill will allow AEP Ohio to make investments that our customers have been asking us to provide." He signed the letter in his capacity as VP of External Affairs for AEP.

52.     Froehle also testified in support of HB6 on behalf of AEP. On June 12, 2019, he testified before Ohio's Energy and Public Utilities Committee during its second hearing on HB6, stating:

House Bill 6 addresses Ohio's increasing reliance on out-of-state generation. ***This bill addresses legacy generation issues that have been plaguing the state for nearly a decade. It will allow AEP Ohio to make investments in renewables that our customers have been asking us to provide.*** Specifically investments that help drive economic development in the state. As a result, this legislation will keep and bring jobs to the state of Ohio.

AEP is focused on bringing more renewable energy resources into our generation mix throughout our 11 state territory for the last several years. Furthermore, all sectors of AEP Ohio customers are increasingly seeking renewable energy sources for their electricity supply. Some large commercial customers have also expressed a desire for renewable power from AEP Ohio. Having these resources readily available helps make Ohio a more attractive place for these companies to locate and expand their operations.

HB 6 would allow AEP Ohio to offer renewable energy services to our customers and pose no financial risk to other customers – this is an economic development tool that AEP Ohio has been seeking clarity on for several years.

*As it relates to Ohio Valley Electric Corporation (OVEC), HB 6 provides ongoing certainty for an important and longstanding baseload generating asset. The bill also includes rates caps for customers while allowing for the continued operation of OVEC generating units, which will provide certainty for AEP Ohio's customers and Ohio jobs.*

Finally, this legislation would allow Ohio's electric utilities to offer voluntary energy efficiency plans similar to those operated by the state's natural gas utilities, a model we believe can be successful. House Bill 6 in its current form allows for AEP Ohio to finish implementation of currently-approved plans and phase out the programs.

AEP Ohio believes this legislation puts Ohio on the path of a balanced energy policy that provides benefits to all customers in this state.

53.     AEP worked directly with Householder and his associates to craft HB6 to the Company's benefit.  For example, on May 9, 2019, AEP's in-house counsel Steven T. Nourse, Denny Larr of Larr Policy Consulting sent an email confirming that their discussions about the bill's provisions were funneled to Householder and his Senior Policy Advisor, Pat Tully:

While we are very grateful and appreciative of everyone working to reach a consensus position, the bottom line is ***this language is now in Pat Tully's hands and it will be up to him and Speaker Householder to make the final determination as to how they would like to address this matter.*** Perhaps we should just let them look at the language and make their decision. After all, ultimately that is the final authority at this time.

54.     Moreover, on June 24, 2019—*i.e.*, one month before HB6 was signed into law— AEP's Director of Government Affairs, Maria L. Haberman, sent proposed amendments for HB6 to Pat Tully.  The following amendments were ultimately incorporated into the final bill that was signed into law and sought to "ensure continuous OVEC cost recovery through 2030" for AEP:

**D. Clarifying amendments for continuous OVEC net impact recovery through 2030**

*(1) Amend definition of "'prudently incurred costs related to a national security generation resource" in section 4928.0l(A)(42) of the Revised Code as follows:*

• In line 1259 after the word "former", insert the following language: "sponsor under such power agreement or"

\*     \*     \*

*(3) Amend new section 4928.148 of the Revised Code as follows:*

• In line 1386, insert the following after the comma: "including recovery of any deferrals that exist at that time,"

### 2.     The Board Knew of the Company's Substantial Contributions to Generation Now

55.     The Board reviewed and discussed the Company's political contributions – thus, the directors knew, or had reason to know, of the contributions to Generation Now, including through EOE:

(a) ████████████████████████████████████
████████████████████████████ ███████████████
██████████████ ██████████████████████████
███████████████████████████████████████████
████████████████████ █████████████████████████
███████████████████████████████████████████
██████████████████████

(b) ████████████████████████████████████
███████████████████████████████████████████
███████████████████ ████████████████████████
███████████████████████████████████████

(c) ████████████████████████████████████
████████████████████████████ ███████████████
███████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

(d)    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

56.    The Board had reason to know of the contributions to EOE and either controlled the use of its donations or had reason to know of the purpose of the contributions.  Froehle contemporaneously served AEP and EOE.  Moreover, James B. Hadden, an attorney who had represented AEP, served as President and director of EOE.  EOE's directors, including those connected to AEP, directed the Company's contributions to Householder's criminal enterprise.

57.    The Board also reviewed and discussed HB6 specifically.  In light of the amendments proposed by AEP, which were in fact adopted into law, these discussions give rise to a reasonable inference that the Board either directed AEP's engagement and involvement with Householder or had knowledge of it:

(a)    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

(b)    ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████

     ████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
     ███████████████████████████████
     ██████████████████

58.     The Board also discussed OVEC and its financial condition, including following the passage of HB6.

(a)     ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

(b)     ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

     ████████████████████████████████
     ████████████████████████████████
     ███████████████████

████████████████████████████████████████████

████████████████

59.     AEP's PAC and its executives also made contributions to Householder's campaign directly:

17

(a)     According to the Energy and Policy Institute and the Columbus Dispatch, on May 20, 2019, AEP's PAC contributed to $12,500 to Householder's June 6, 2019 birthday fundraiser.  According to the federal affidavit in the criminal case against Householder, this fundraiser was held one day before the week Generation Now was set to spend $2 million on media in support of H6.

(b)     Between October 18 and November 18, 2019, 39 AEP employees contributed to Householder's campaign.  The largest contribution was from defendant Akins, who donated $5,000.  Specifically:

**11/7/2019 Householder event:**

- $1,500 from Lisa Barton, AEP's executive vice president of utilities, who oversees the activities of all of the utility's operating companies

- $1,500 from Lana Hillebrand, AEP's chief administrative officer

- $1,500 from Charles Patton, AEP's executive vice president of external affairs

- $1,500 from Charles Zebula, AEP's executive vice president of energy supply

- 1,500 from Raja Sundararajan, president and CEO of AEP Ohio

**11/17/2019 Householder event:**

- $1,500 from David Feinberg, AEP's executive vice president, general counsel and secretary

- $1,500 from Mark McCollough, AEP executive vice president of transmission

- $1,000 from Paul Chodak, executive vice president of generation

Brian Tierney, AEP's chief financial officer contributed an additional $1,500 on November 17[, 2019].

(c)     AEP also contributed to seven Ohio state representatives after they joined the 15-member Ohio House Select Committee on Energy Policy and Oversight, which was tasked

with repealing and replacing HB6. The Company's PAC contributed a total of $7,500 to the campaigns of seven state representatives in September 2020.

60. During AEP's conference call held in connection with the second quarter 2020 financial results, defendant Akins admitted that "Starting in 2015, AEP contributed a total of $8.7 million to Empowering Ohio's Economy." He stated that "publicly available tax forms filed by Empowering Ohio's Economy shows that it made a number of grants over time to a wide variety of charitable organizations under 501(c)(3) and social welfare organizations under 501(c)(4)." The grant agreement between EOE and Generation Now shows that the contributions were precisely of the type used in connection with the Householder bribery scandal. Specifically, the agreement permits Generation Now to use AEP's contributions for "educating, equipping, mobilizing our citizens to take action on critical economic and legislative issues," and EOE's 2019 Form 990 confirms that it "received documentation from the organization that received grants during the year which ensures the funds are not otherwise diverted from their intended use."

61. During the same conference call, defendant Akins also acknowledged that the Company's disclosures with respect to political donations were incomplete in that 501(c)(4) organizations are not required to disclose their donors. Defendant Akins stated that "[w]ith that in mind, we will commit to include additional disclosures in our corporate accountability report with respect to contributions that we made to 501(c)(4) organizations in 2020 and going forward."

62. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

63. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

64. The Individual Defendants knew of AEP's contributions to EOE, which was within AEP's control.  Thus, they knew or recklessly ignored that AEP was using shareholder funds to improperly influence legislation in Ohio, including through the use of bribes, which presented a significant risk of regulatory and criminal scrutiny of AEP.  Nonetheless, the Individual Defendants failed to take any steps to halt the improper practices or to protect AEP from harm, in breach of their fiduciary duties.

**C.    The Truth Begins to Emerge**

65. On July 26, 2020, the *Columbus Dispatch* published an article entitled "Columbus utility giant AEP funded dark money spending in HB 6 campaign," revealing the Company's involvement in the passage of HB6.  Specifically, it stated:

> *A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.*
>
> *Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group* that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

***An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."***

***A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Power***, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

\*        \*        \*

***AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio [residential] electricity customers. Industrial and commercial customers can pay up to $1,500 a month. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.***

The plants – Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana – were built in the mid-1950s to supply electricity to the former uranium-enrichment plant near Piketon, Ohio. ***AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.***

\*        \*        \*

American Electric Power's political action committee contributed nearly $672,000 to Ohio politicians and parties between 2016 and mid-2020, including $17,250 to Householder and $86,792 to the House Republicans' campaign account.

\*        \*        \*

Empowering Ohio's Economy spent $162,500 on lobbying between 2016 and 2018, according to its tax filings. ***The group was not registered with the state as attempting to influence legislation.***

***The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now*** all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

***It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."***

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

*     *     *

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around ***the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history.***

66.     On this news, the Company's share price fell $4.67 per share, or over 5%, to close at $81.16 per share on July 27, 2020, on unusually heavy trading volume.

67.     On December 2, 2020, additional details surfaced when *Dayton Daily News* reported that AEP contributed $900,000 to the groups at the center of the HB6 scandal. Specifically, the article stated:

A nonprofit funded by Columbus-based American Electric Power gave $900,000 over three years to two groups that don't have to disclose their donors and are involved in a federal public corruption investigation, records show.

IRS documents filed in November and obtained by the Dayton Daily News show the nonprofit Empowering Ohio's Economy Inc. donated $550,000 in 2019, $50,000 in 2018 and $100,000 in 2017 to Generation Now, which federal prosecutors allege was the primary vehicle for funneling bribes to former Ohio House Speaker Larry Householder.

Empowering Ohio's Economy also gave $200,000 to Coalition for Growth & Opportunity, another nonprofit group linked to the federal case.

22

68.     On May 31, 2021, the Company disclosed that defendant Tierney was leaving his position at the Company and would receive cash and equity benefits worth approximately $1.2 million.

69.     On June 10, 2021, the *Ohio Capital Journal* published an article titled "Feds seize records from Ohio utility tied to bailout, corruption scandal," which reported that AEP had disclosed: "AEP recently received a subpoena from the Securities and Exchange Commission, Division of Enforcement (SEC) seeking various documents, including documents relating to the benefits to the company from the passage of H.B. 6 and documents relating to our financial processes and controls[.]"  According to AEP's fiscal 2021 annual report filed on February 24, 2022, the SEC's investigation is ongoing.

70.     On November 22, 2021, the Energy and Policy Institute published a report titled "American Electric Power-backed dark money group spent over $1.5 million 2020," which reported that, "Empowering Ohio's Economy, a group funded solely by American Electric Power, contributed more than $1.5 million to dark money groups in 2020, according to the organization's tax filings."  The article continued:

> The source of Empowering Ohio's Economy's funding remained a secret until last year, when the group became ensnared in the public corruption scandal surrounding Ohio's House Bill 6, the 2019 law that increased and extended ratepayer-funded subsidies for the Ohio Valley Electric Corporation coal plants largely owned by AEP. Nicholas Akins, the CEO of American Electric Power (AEP), admitted during an earnings call in August 2020 that AEP had contributed $8.7 million to Empower Ohio's Economy since 2015, which represented all of the group's funding as of 2019.

> *        *        *

> The Energy and Policy Institute obtained a copy, marked "DRAFT," of the Empowering Ohio's Economy's annual Form 990 for 2020 from the group. 501(c)(4) groups are legally required by the Internal Revenue Service to provide Form 990s to the public upon request.

Empowering Ohio's Economy reported no new revenue in 2020, meaning all of the money it spent last year originated from contributions AEP made to the group in previous years.

The group spent over $1.6 million in 2020, most of which went to the $1.5 million in contributions that Empowering Ohio's Economy made to other 501(c)(4) groups, which are not required to disclose their donors.

71.     The Energy and Policy Institute report further revealed that:

One 501(c)(4) group, called Open Road Path, received over $1 million from Empowering Ohio's Economy in 2020. At the end of last year, Open Road Path was sitting on a bankroll of nearly $3 million, according to a copy of the group's 2020 Form 990.

Empowering Ohio's Economy also contributed $2 million to Open Road Path in 2019, meaning all of Open Road Path's known funding came from the AEP-backed Empowering Ohio's Economy….

The board of directors for Open Road Path included attorney J.B. Hadden, who has served as outside counsel for AEP. Tom Froehle, who was vice president of external affairs for the utility, also served on the group's board.

Hadden and Froehle both served on the board of Empowering Ohio's Economy.

AEP announced this summer that Froehle would be retiring from the company after 11 years on the job. The announcement included no mention of Froehle's role in Empowering Ohio's Economy and Open Road Path, or the H.B. 6 corruption scandal.

72.     The report additionally noted that AEP had contributed to groups attacking

candidates who voted against H.B. 6:

Liberty Ohio Inc. received $50,000 in 2020 from Empowering Ohio's Economy. The group, yet another 501(c)(4), also received $50,000 from Empowering Ohio's Economy in 2019, for a total of $100,000.

Last year, Liberty Ohio was behind a website and ads targeting the Republican primary for Ohio's 4th State Senate district. The group attacked candidate Candice Keller, who as a member of the Ohio House in 2019 voted against H.B. 6. Keller lost the primary to another state representative, George Lang, who voted for H.B. 6 and received campaign money from AEP's PAC.

Liberty Ohio raised over $1 million in 2019, about $150,000 of which can be traced back to FirstEnergy.

73.     Finally, the Energy and Policy Institute report described other secret spending linked to AEP:

> The Energy and Policy Institute also obtained a copy of the 2020 annual report filed with the IRS by the Ohio Governor's Residence and Office Foundation, another 501(c)(4) that counts Hadden among its board members.
>
> Governor Mike DeWine and key members of his staff reported receiving gifts, food and beverages from the Ohio Governor's Residence and Office Foundation in 2019 and 2020.
>
> In 2020, the Ohio Governor's Residence and Office Foundation raised only $23,500 from contributions, down from $372,000 in 2019.
>
> Empowering Ohio's Economy contributed $25,000 to the Ohio Governor's Residence and Office Foundation in 2019. The group's other sources of funding remain a mystery.

74.     On March 11, 2022, U.S. District Judge Timothy Black set a schedule in the criminal action against Householder that includes a trial date of January 23, 2023.

**D.      Defendant Akins, Tierney, and Beasley Sold More than $16 Million in AEP Stock While in Possession of Material Non-Public Information**

<u>Akins</u>

75.     Defendant Akins was the Company's CEO with a highly sophisticated understanding of the Company's involvement with HB6.

76.     As set forth herein, defendant Akins possessed material negative information which he knew was being concealed from investors.  Defendant Akins consciously acted to exploit his knowledge by selling nearly $12.5 million of AEP stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/1/2017 | 19,829 | $67.64 | $1,341,234 |
| 5/1/2018 | 19,184 | $68.63 | $1,316,598 |
| 5/1/2019 | 5,457 | $83.67 | $456,587 |
| 5/2/2019 | 11,152 | $84.94 | $947,251 |
| 2/24/2020 | 1,900 | $102.20 | $194,180 |
| 2/24/2020 | 37,807 | $100.57 | $3,802,250 |
| 2/24/2020 | 29,950 | $101.58 | $3,042,321 |

25

| | | | |
|---|---|---|---|
| 5/4/2020 | 5,632 | $81.97 | $461,655 |
| 5/4/2020 | 5,813 | $80.99 | $470,795 |
| 5/4/2020 | 5,074 | $82.87 | $420,482 |
| | **141,798** | | **$12,453,353** |

77.    Defendant Akins thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Tierney

78.    Defendant Tierney is the CFO of the Company with a highly sophisticated understanding of the Company's involvement with HB6.

79.    As set forth herein, defendant Tierney possessed material negative information which he knew was being concealed from investors. Defendant Tierney consciously acted to exploit his knowledge by selling over $2.5 million of AEP stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/1/2017 | 5,586 | $67.64 | $377,837 |
| 5/1/2018 | 3,464 | $68.63 | $237,734 |
| 5/1/2019 | 1,539 | $83.67 | $128,768 |
| 5/1/2019 | 1,402 | $84.95 | $119,100 |
| 5/14/2019 | 4,392 | $86.02 | $377,800 |
| 7/29/2019 | 4,458 | $89.73 | $400,016 |
| 2/24/2020 | 18,573 | $101.55 | $1,886,088 |
| | **39,414** | | **$3,527,343** |

80.    Defendant Tierney thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Beasley

81.    Defendant Beasley is a director of the Company with a highly sophisticated understanding of the Company's involvement with HB6.

82.    As set forth herein, defendant Beasley possessed material negative information which he knew was being concealed from investors. Defendant Beasley consciously acted to

exploit his knowledge by selling over $157,155 worth of AEP stock to his substantial benefit on February 26, 2020 when he sold 1,613 shares for $97.43 per share. Following such sale, defendant Beasley did not hold any shares of AEP stock.

83.     Defendant Beasley thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.     DAMAGES TO THE COMPANY

84.     As a direct and proximate result of the Individual Defendants' conduct, AEP has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)     Expenses incurred in connection with investigations regarding AEP's involvement with HB6 and Householder's criminal enterprise;

b)     Fines and/or penalties paid in connection with the resolution of the SEC's investigation;

c)     Funds expended on improper or illegal political lobbying and/or bribes; and

d)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to AEP.

85.     In addition, AEP's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

86.     The actions complained of herein have irreparably damaged AEP's corporate image and goodwill.  For at least the foreseeable future, AEP will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that AEP's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.    Plaintiffs bring this action derivatively in the right and for the benefit of AEP to redress injuries suffered, and to be suffered, by AEP as a direct result of breaches of fiduciary duty by the Individual Defendants and insider trading.  AEP is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

88.    Plaintiffs will adequately and fairly represent the interests of AEP in enforcing and prosecuting its rights.

89.    Plaintiffs have continuously been shareholders of AEP at times relevant to the wrongdoing complained of and are current AEP shareholders.

90.    When this action was filed, AEP's Board consisted of defendants Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Rasmussen, Richard, and Tucker, and non-party director Roberts.  Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

91.    Defendant Akins is the Company's CEO and, therefore, is not independent under NASDAQ listing rules.  As an employee, defendant Akins derives substantially all of his income from his employment with AEP, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO, oversaw the Company's day-to-day activities as the Company's senior executive, participated in and was aware of the improper bribery efforts, and took action to cause and failed to take action to prevent or halt the improper bribery activities that exposed the Company to substantial harm.  Accordingly,

defendant Akins faces a substantial risk of liability and thus would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

92.     Defendants Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker served as the members of the Governance Committee at all relevant times.  As such, they are responsible for the Company's corporate governance matters, including reviewing AEP's political contributions.   In their capacities as Governance Committee members, as alleged herein, defendants Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker reviewed and discussed ███████████████████████████████████████████████████████

███████████████████, and therefore knew or had reason to know of AEP's contributions to EOE and Generation Now.[1]  Moreover, as AEP is the sole contributor to EOE, these directors had reason to know that these funds would be used to improperly influence the environmental legislation in Ohio through Householder, including through Froehle who simultaneously served EOE as director and AEP as VP of External Affairs.  Thus, the Governance Committee members knew or recklessly ignored the bribery activities which presented a risk of regulatory and criminal scrutiny of AEP.   As alleged herein, defendants Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker breached their fiduciary duties and are not disinterested, and demand is excused as to them.

---

[1] In response to the Demand, Company counsel represented that, ████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████ However, defendant Akins admitted that the Company had contributed $8.7 million to EOE since 2015, and the books and records production discloses ███ ████████████████████████ indicating that the Company's management and directors knew or had reason to know of the contributions to EOE.  Or, if they did not know of the contributions to EOE, then defendants Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker face a substantial risk of liability for their failure to institute internal controls with respect to political contributions because they were wholly unaware of the significant amount and use of funds contributed by AEP to EOE, an entity that operates solely with AEP's funds.

93.     Defendants Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its public statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, defendants Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy reviewed and approved the disclosures regarding the impact of HB6 on the Company's operations.  These directors also knew of OVEC dire financial condition, as it had approximately $1.3 billion of debt with only $3 million in net income, and of AEP's financial risk exposure to OVEC, in which the Company held a nearly 44% stake.  As a result, the Audit Committee members knew or had reason to know of the Company's involvement in the passage of HB6 to evaluate its financial impact on AEP's operations, but failed to take any action to prevent or halt such activities or to disclose the same. Thus, defendants Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy breached their fiduciary duties and are not disinterested, and demand is excused as to them.

94.     Defendants Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker served as the members of the Policy Committee at all relevant times.  As such, they are responsible for evaluating major public issues affecting the Company, as well as established policies that affect AEP's relationship with its service areas.  In their capacities as Policy Committee members, defendants Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker necessarily reviewed and discussed the impact of HB6 on the Company's operations and on AEP's relationship with Ohioans.  As a result, the Policy Committee members knew or had reason to know of the Company's involvement in the passage of HB6 to evaluate its financial impact on AEP's operations, yet failed to take any action to prevent or halt such activities

or otherwise to protect the Company from harm with respect thereto, and failed disclose the same and allowed the materially misleading statements to be disseminated in AEP's SEC filings and other disclosures. Thus, defendants Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker breached their fiduciary duties and are not disinterested, and demand is excused as to them.

95.     Plaintiffs have not made any demand on the other stockholders of AEP to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     AEP is a publicly held company with almost 500 million shares outstanding and thousands of stockholders as of October 22, 2020;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

96.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

97.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AEP's business and affairs.

98.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AEP.

99.    In breach of their fiduciary duties owed to AEP, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

100.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, AEP has sustained and continues to sustain significant damages, including direct monetary damages and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

101.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

102.    As a result of the wrongdoing described herein, the Individual Defendants have caused AEP to waste its assets by supporting dark money lobbying organizations and paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

103.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

104.    Plaintiffs, on behalf of AEP, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

105.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

106. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AEP. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to AEP.

107. Plaintiffs, as shareholders and representatives of AEP, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

108. Plaintiffs, on behalf of AEP, have no adequate remedy at law.

## COUNT IV

**Against Defendants Akins, Tierney, and Beasley—Breach of Duty for Insider Trading**

109. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

110. As alleged above, defendants Akins, Tierney, and Beasley are fiduciaries of AEP, possessed material, non-public information of AEP, and used that information improperly to profit from sales of AEP stock. When defendants Akins, Tierney, and Beasley directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

111. When defendants Akins, Tierney, and Beasley sold their AEP stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of AEP stock would be significantly lower. Defendants Akins, Tierney, and Beasley timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher

price for the stock they sold. They thereby benefitted by misappropriating AEP's non-public information.

112.     Plaintiffs, on behalf of AEP, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of AEP, demand judgment as follows:

A.     Declaring that Plaintiffs may maintain this action on behalf of AEP and that Plaintiffs are adequate representatives of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Directing AEP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AEP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.     a proposal to prohibit the Company from providing support, monetary or otherwise, to any dark money lobbying organizations;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.     a proposal to strengthen AEP's oversight of its disclosure procedures;

4.     a provision to control insider transactions;

5. a provision to permit the shareholders of AEP to nominate at least three candidates for election to the Board; and

6. a proposal to strengthen the Company's controls over financial reporting.

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of AEP have an effective remedy;

E. Awarding to AEP restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: March 21, 2022          */s/ John Camillus*          
**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
E-mail: jcamillus@camilluslaw.com

*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
        prajesh@glancylaw.com

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
Emily R. Bishop
5040 Shoreham Place
San Diego, California 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com
        ebishop@robbinsllp.com

*Co-Lead Counsel for Plaintiffs*

**LAW OFFICE OF ALFRED G. YATES, JR.**
Alfred G. Yates, Jr.
1575 McFarland Road, Suite 305
Pittsburgh, Pennsylvania 15216
Telephone: (412) 391-5164

**BARR LAW GROUP**
Leonid Kandinov
501 W Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4966
Facsimile: (619) 400-4810

*Additional Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys on record.

*/s/ John C. Camillus*
John C. Camillus
