UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

:

IN RE AEP STOCKHOLDER
DERIVATIVE LITIGATION

Case Nos. 2:21-cv-163, 2:21-cv-1611
Judge Sarah D. Morrison
Magistrate Judge Elizabeth A.
Preston Deavers

:

## OPINION AND ORDER

This consolidated shareholder derivative action is before the Court on Defendants' Motion to Dismiss (Mot. to Dismiss, ECF No. 24[1]) and non-party David Speiser's Motion to Intervene (Mot. to Intervene, ECF No. 31). The motions, fully briefed, were argued before the Court on March 17, 2023. (*See* ECF No. 38.) For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** and Mr. Speiser's Motion to Intervene is **DENIED.**

**I.     MOTION TO DISMISS**

    **A.     Factual Background**[2]

All well-pled factual allegations in the operative Amended Verified Shareholder Derivative Complaint (Am. Compl., ECF No. 15) are considered as true for purposes of the Motion to Dismiss. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). The following summary draws from the allegations in that Amended

---

[1] ECF numbers refer to the docket in *Kogus v. Akins*, No. 2:21-cv-163 (S.D. Ohio).

[2] Many of these same facts are recited in the Background of the Opinion and Order granting defendants' motion to dismiss in a related case, *Nickerson v. Am. Elec. Power, Inc.*, No. 2:20-cv-4243 (S.D. Ohio, filed on December 20, 2021).

Complaint, the documents integral to and incorporated therein, and certain other documents which are subject to judicial notice.

1.  **The Parties**

AEP is a public utility holding company that, through its subsidiary AEP Ohio, provides electricity to nearly 1.5 million retail customers in Ohio. (Am. Compl., ¶ 39.)

Named Plaintiffs Esther Kogus and Robert L. Reese are AEP shareholders who bring this action, on behalf of Nominal Defendant AEP, against a number of AEP's current and former officers and directors (the "Individual Defendants"). (*Id.*, ¶¶ 11–13, 87.) The Individual Defendants are:

- Nicholas K. Akins, President, CEO, and Board Chair (*id.*, ¶ 14);
- Brian X. Tierney, Executive Vice President, former-CFO (*id.*, ¶ 15);
- Thomas E. Hoaglin, Director (*id.*, ¶ 16);
- David J. Anderson, Director (*id.*, ¶ 17);
- J. Barnie Beasley, Jr., Director (*id.*, ¶ 18);
- Ralph D. Crosby, Jr., former-Director (*id.*, ¶ 19);
- Art A. Garcia, Director (*id.*, ¶ 20);
- Linda A. Goodspeed, Director (*id.*, ¶ 21);
- Sandra Beach Lin, Director (*id.*, ¶ 22);
- Margaret M. McCarthy, Director (*id.*, ¶ 23);
- Richard C. Notebaert, former-Director (*id.*, ¶ 24);
- Lionel L. Nowell III, former-Director (*id.*, ¶ 25);
- Stephen S. Rasmussen, former-Director (*id.*, ¶ 26);

- Oliver G. Richard, III, Director (*id.*, ¶ 27); and
- Sara Martinez Tucker, Director (*id.*, ¶ 28).

Except Mr. Tierney, each Individual Defendants has served on AEP's Board of Directors.

AEP's Board has several committees, including the Governance Committee, Audit Committee, and Policy Committee. The Governance Committee charter provides, *inter alia*, that it will:

- Oversee on a continuing basis the implementation of the AEP Corporate Compliance Program, including reporting by the chief compliance officer, the development of specific programs of legal compliance in various important areas of concern to the operation of AEP System companies, and the designation of successor chief compliance officers.
- Oversee the Company's Sustainability Report, including the portion of the report that relates to the Company's political contributions.

(*Id.*, ¶ 35 (alterations omitted).) The Audit Committee charter provides that it will "oversee the process of identifying major enterprise risks, including strategic, operational, and financial risks, and assure that all such risks are communicated to the Board for assignment of oversight among the Board and its Committees." (*Id.*, ¶ 37 (alterations omitted).) And the Policy Committee charter provides that it is "responsible for examining the Company's policies on major public issues affecting the Company and its subsidiaries, including environmental, industry change and other matters, as well as established policies that affect the relationship of the Committee [sic] and its subsidiaries to their service areas and the general public." (*Id.*, ¶ 38.) During the relevant period, Mr. Hoaglin, Mr. Garcia, Ms. Lin, Mr. Notebaert, Mr. Nowell, Mr. Rasmussen, and Ms. Tucker served on the Governance Committee; Mr. Hoaglin, Mr. Anderson, Ms. Goodspeed, Ms. Lin, and Ms. McCarthy

3

served on the Audit Committee; and all Individual Defendants (except Mr. Tierney) served on the Policy Committee. (*Id.*, ¶¶ 14–28.)

### 2. Ohio's House Bill 6 benefitted AEP, as majority owner of two unprofitable coal-fired power plants.

AEP is a part-owner of the Ohio Valley Electric Corporation, which operates two coal-fired electricity generation plants along the Ohio River (the "OVEC Plants"). (*Id.*, ¶ 40.) The OVEC Plants are not profitable, having sold electricity at a loss since 2012. (*Id.*, ¶ 42.) As of 2019, "OVEC had approximately $1.3 billion of debt and only $3 million in net income for" the year. (*Id.*) OVEC's poor financial position posed a problem for AEP, its largest shareholder. (*Id.*, ¶ 40.)

In July 2019, the Ohio General Assembly passed House Bill 6, which provided cost recovery for the OVEC Plants, among other things. (*Id.*, ¶ 43.) While HB 6 made its way through the legislature, AEP deployed significant resources advocating for the passage of favorable provisions. For example, AEP's Vice President of External Affairs, Tom Froehle, sent a letter to the Ohio House and testified before the Energy and Public Utilities Committee expressing AEP's support for the bill. (*Id.*, ¶¶ 51–52.) In addition, AEP staff and consultants "worked directly with [then-Speaker of the Ohio House of Representatives Larry] Householder and his associates to craft HB 6 to the Company's benefit." (*Id.*, ¶¶ 53–54.)

### 3. House Bill 6 has since been at the center of criminal racketeering and corruption charges.

In July 2020, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now were indicted by a federal grand jury

4

on racketeering and corruption charges related to the passage of HB 6. (*Id.*, ¶ 45. *See also* Mot. to Dismiss Ex. 7, ECF No. 24-8; *United States v. Householder*, No. 1:20-cr-00077-TSB (S.D. Ohio, filed on July 30, 2020).) An Affidavit filed in the criminal case describes the basis for the charges as follows:

> [F]rom March 2017 to March 2020, [the criminal defendants, known as "Householder's Enterprise,"] received approximately $60 million from [FirstEnergy Corp.[3]] entities, paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from [FirstEnergy], Householder's Enterprise helped pass House Bill 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with [FirstEnergy]. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from [FirstEnergy] affiliates through multiple entities that it controlled [including Generation Now and Coalition for Growth & Opportunity]. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

(Mot. to Dismiss Ex. 15, ECF No. 24-16, ¶ 9.) Mr. Longstreth admitted[4] that Generation Now was used "as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become

---

[3] Although identified by the pseudonym "Company A" in the Affidavit, FirstEnergy Corp. has since acknowledged its role in a Deferred Prosecution Agreement entered into with the United States Attorney's Office for the Southern District of Ohio. (Mot. to Dismiss Ex. 8, ECF No. 24-9; *see also United States v. FirstEnergy Corp.*, 1:21-cr-00086-TSB (S.D. Ohio, filed on July 22, 2021).)

[4] Mr. Longstreth, Mr. Cespedes, and Generation Now all pled guilty. (Am. Compl., ¶¶ 47–48.) A trial jury returned guilty verdicts against Mr. Householder and Mr. Borges. *See United States v. Householder*, No. 1:20-cr-00077-TSB (S.D. Ohio, verdict entered on March 9, 2023).

Speaker of the Ohio House of Representatives." (Am. Compl., ¶ 48; *see also* Mot. to Dismiss Ex. 10, ECF No. 24-11.) Mr. Cespedes further admitted to orchestrating payments to Generation Now "in return for specific official action by Householder relating to the passage and preservation of" HB 6 and to defeat the subsequent ballot initiative seeking its repeal. (Am. Compl., ¶ 3; *see also* Mot. to Dismiss Ex. 11, ECF No. 24-12.)

### 4. EOE (an AEP-funded non-profit) contributed to organizations implicated in the bribery scheme.

Between 2015 and 2020, AEP contributed nearly $9 million to Empowering Ohio's Economy ("EOE"), a "social welfare" organization exempt from tax under 26 U.S.C. § 501(c)(4). (Am. Compl., ¶ 60.) AEP was the sole contributor to EOE, but did not publicly disclose its contributions before July 2020. (*Id.*, ¶¶ 49, 60.) EOE's five-member board of directors included Mr. Froehle and James B. Hadden, "an attorney who had represented AEP[.]" (*Id.*, ¶ 56. *See also* Mot. to Dismiss Ex. 12, ECF No. 24-13, PAGIED # 607.) Notably, EOE contributed $200,000 to Coalition for Growth & Opportunity and $100,000 to Generation Now in 2017; $50,000 to Generation Now in 2018; and $550,000 to Generation Now in 2019. (Am. Compl., ¶ 67.)

On July 26, 2020, The Columbus Dispatch published an article titled *Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign*.[5] (*Id.*, ¶ 65.) The article described AEP's contributions to EOE; Mr. Froehle and Mr.

---

[5] Randy Ludlow, *Columbus Utility Giant AEP Funded Dark Money Spending in HB 6 Campaign*, THE COLUMBUS DISPATCH (July 25, 2020, 12:22 PM), https://www.dispatch.com/story/news/politics/state/2020/07/25/columbus-utility-giant-aep-funded-dark-money-spending-in-hb-6-campaign/41843419/.

6

Hadden's involvement with EOE's board; EOE's contributions to Generation Now and Coalition for Growth & Opportunity; and Generation Now and Coalition for Growth & Opportunity's role in the racketeering scheme charged in the criminal indictment. (*Id.*) In Plaintiffs' view, the article "reveal[ed] the Company's involvement in the passage of HB 6." (*Id.*) The next day, AEP's "share price fell $4.67 per share, or over 5%, to close at $81.16 per share . . . on unusually heavy trading volume." (*Id.*, ¶ 66.) Later reporting publicly revealed details of EOE's contributions and expenditures. (*See id.*, ¶¶ 67, 69, 70–73.)

In August 2020, Mr. Akins addressed the issue on a quarterly earnings call. (*Id.*, ¶ 60.) He acknowledged that AEP had contributed significant amounts to EOE and "commit[ed]" AEP to disclosing its contributions to 501(c)(4) organizations in the future. (*Id.*, ¶¶ 60–61.)

### 5. Plaintiffs allege that the Individual Defendants knew of the criminal bribery scheme.

Forming the backbone of their claims, Plaintiffs allege that the Individual Defendants:

> knew of AEP's contributions to EOE, which was within AEP's control. Thus, they knew or recklessly ignored that AEP was using shareholder funds to improperly influence legislation in Ohio, including through the use of bribes, which presented a significant risk of regulatory and criminal scrutiny of AEP. Nonetheless, the Individual Defendants failed to take any steps to halt the improper practices or to protect AEP from harm[.]

(*Id.*, ¶ 64.) To support their conclusion, Plaintiffs further allege the following facts:

- "HB 6 was a priority for AEP" to the extent it allowed the company to avoid recording an impairment charge on its books. (*Id.*, ¶ 50.)

- AEP employees, including some at the executive level, corresponded with legislative staff about the bill. (*Id.*, ¶¶ 50, 53, 54.)

7

- When HB 6 was revised to include OVEC cost-recovery provisions, Tom Froehle openly supported the bill on AEP's behalf. (*Id.*, ¶¶ 51, 52.)

- At meetings in 2018, 2019, and 2020, the Governance Committee "reviewed and discussed the Company's political contributions during [the preceding year] as well as activities of the Company's political action committee ('PAC')." At a meeting in 2018, the full Board did the same. (*Id.*, ¶ 55(a); *see also id.*, ¶¶ 55(b), (c), (d).

- At meetings in 2019, the Board and the Audit Committee "reviewed and discussed" HB 6 and its potential impact on OVEC's financial condition. (*Id.*, ¶¶ 57, 58.)

- "AEP's PAC and its executives . . . made contributions to Householder's campaign directly[.]" (*Id.*, ¶ 59.)

In Plaintiffs' view, these facts establish that "EOE was used as a smoke screen for the Company to divert funds to finance the passage of HB 6 while concealing AEP's involvement in the bribery scheme." (*Id.*, ¶ 49.)

### B. Procedural Background

Ms. Kogus filed suit on January 15, 2021. (ECF No. 1.) After demanding to inspect AEP's books and records under N.Y. BUS. CORP. LAW § 624, Mr. Reese filed a separate action. *See Reese v. Akins*, No. 2:21-cv-1611 (S.D. Ohio, filed on April 7, 2021). The cases were then consolidated. (ECF No. 6.) On March 29, 2022, Plaintiffs filed their joint Amended Verified Shareholder Derivative Complaint. (Am. Compl.) The Amended Complaint asserts the following counts:

Count I: Breach of Fiduciary Duty
(All Individual Defendants)

Count II: Waste of Corporate Assets
(All Individual Defendants)

Count III: Unjust Enrichment
(All Individual Defendants)

8

    Count IV:    Breach of Duty for Insider Trading
                   (Akins, Tierney, Beasley)

(*Id.*, *generally*.) Defendants move to dismiss the Amended Complaint in its entirety. (Mot. to Dismiss.)

### C. Legal Standard

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Directv, Inc. v. Treesh*, 487 F.3d, 471, 476 (6th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

A shareholder derivative action must also satisfy the heightened pleading standard set forth in Rule 23.1, which requires a complaint to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . ; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); *see also* N.Y. BUS. CORP. LAW § 626(c). This standard "differs substantially" from ordinary notice pleading. *See McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)) *amended on denial of reh'g*, 250 F.3d 997 (6th Cir. 2001). "If [p]laintiffs do not comply with the requirements of Rule 23.1, they do not have standing to bring suit." *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617 (6th Cir. 2008).

**D.     Analysis**

Defendants argue that the Amended Complaint must be dismissed for two reasons: First, because Plaintiffs do not allege with particularity that their failure to make a pre-suit demand on the Board was excused; and Second, because Plaintiffs fail to state a claim upon which relief may be granted. (Mot. to Dismiss.) Because the first argument is well-taken and dispositive, the Court does not discuss the second.

When derivative claims are brought under federal law, courts look to the law of the state of incorporation—here, New York—to determine whether pre-suit demand is excused. *McCall*, 239 F.3d at 815 (6th Cir. 2001). Under New York law, a corporation's directors have "primary responsibility for acting in the name of the corporation[.]" *Wandel v. Eisenberg*, 871 N.Y.S.2d 102, 104 (N.Y. App. Div. 2009) (quoting *Bansbach v. Zinn*, 801 N.E.2d 395, 400 (N.Y. 2003)). Because shareholder

10

derivative actions, "[b]y their very nature, . . . infringe upon" that responsibility, New York courts "have historically been reluctant to permit" their prosecution. *Marx v. Akers*, 666 N.E.2d 1034, 1037 (N.Y. 1996). Yet, those courts recognize that derivative actions "serve the important purpose of protecting corporations and minority shareholders against officers and directors who, in discharging their official responsibilities, place other interests ahead of those of the corporation." *Bansbach*, 801 N.E.2d at 400. Requiring that a plaintiff either make a pre-suit demand on the board, or allege with particularly why such demand would have been futile, is intended to balance those competing interests. *In re Comverse Tech., Inc. Derivative Litig.*, 866 N.Y.S.2d 10, 15 (N.Y. App. Div. 208).

> Under New York law, demand is futile, and therefore excused, when:
>
> (1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction.

*Marx*, 666 N.E.2d at 1039. As of the filing of this case, the Board consisted of Mr. Akins, Mr. Hoaglin, Mr. Anderson, Mr. Beasley, Mr. Crosby, Mr. Garcia, Ms. Goodspeed, Ms. Lin, Ms. McCarthy, Mr. Notebaert, Mr. Rasmussen, Mr. Richard, Ms. Tucker, and non-party Mr. Daryl Roberts (together, the "Demand Board"). (Am. Compl., ¶ 90.) *See In re Comverse*, 866 N.Y.S.2d at 15 (evaluating demand futility by looking at "the board as it existed at the time the action was commenced"). The question, then, is whether the Amended Complaint alleges particularized facts establishing that demand would have been futile, under *Marx*, as to eight or more members of the Demand Board. The Court concludes that it does not.

11

### 1. Plaintiffs have not alleged with particularity that any of the Demand Board members were "interested."

The first circumstance in which demand would be futile is when a majority of the directors are "interested." *Marx*, 666 N.E.2d at 1039. "Under New York law, a director may be interested under either of two scenarios: self-interest in the transaction or loss of independence due to the control of an interested director." *In re Comverse*, 866 N.Y.S.2d at 15 (citing *Bansbach*, 801 N.E.2d at 402–03). Plaintiffs invoke the first of those scenarios here. (*See* ECF No. 29, PAGEID # 864.) In their view, Mr. Akins and Mr. Beasley are "self-interested" because they sold AEP shares between May 2017 and May 2020.[6] But New York courts have been clear: Self-interest exists, for demand futility purposes, where a director "will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Marx*, 666 N.E.2d at 1042. The benefit Mr. Akins and Mr. Beasley obtained "does not appear to differ from a benefit that may have accrued to [AEP] shareholders generally." *In re Comverse*, 866 N.Y.S.2d at 15 (finding no self-interest for directors who sold shares at prices alleged to be artificially inflated due to granting backdated stock options).

### 2. Plaintiffs have not alleged with particularity that the Demand Board failed to reasonably inform themselves.

The second circumstance in which demand would be futile is when "the directors failed to inform themselves to a degree reasonably necessary about the

---

[6] Mr. Akins is alleged to have sold 141,798 shares of AEP stock over ten transactions completed between May 1, 2017, and May 4, 2020. (Am. Compl., ¶ 76.) Mr. Beasley is alleged to have sold 1,613 shares of AEP stock on February 26, 2020. (*Id.*, ¶ 82.)

12

transaction." *Marx*, 666 N.E.2d at 1039. Plaintiffs argue that AEP's Board of Directors "was duty-bound to inform itself regarding the illegal scheme to provide so-called political contributions to fund Householder's campaign in exchange for ensuring the passage of HB 6 and the bailout of the Company's plants[.]" (ECF No. 29, PAGEID # 862.) But the Amended Complaint fails to allege with particularity that the Individual Defendants had any "knowledge or information" putting them on actual or constructive notice of the wrongdoing. *Wandel*, 871 N.Y.S.2d at 105.

In *Wandel v. Eisenberg*, 871 N.Y.S.2d 102 (N.Y. App. Div. 2009), New York's Appellate Division considered a derivative action brought by shareholders of retailer Bed Bath & Beyond (BB&B) without pre-suit demand. The action stemmed from public revelations that BB&B's board had identified deficiencies in its process for granting stock options, and was working to correct them. The court analyzed whether the complaint alleged with particularity that demand would have been futile. In discussing the second *Marx* test, the court distinguishing the *In re Comverse* complaint, in which the plaintiffs alleged that

> (1) unanimous written consents for grants of stock options were sometimes presented to the compensation committee for signature more than a month after the grant date in circumstances where the stock price had risen dramatically in the intervening period, and yet were approved without question or inquiry; (2) compensation committee members orally approved option grants in direct violation of the company's bylaws; and (3) the compensation committee had a list of individuals who received option grants in 2001 that contained more than two dozen names of individuals who were not Comverse employees, which names were used for options placed in a slush fund for later use, yet not even a cursory check or inquiry was made by the compensation committee.

13

*Id.* at 105. These allegations satisfied the second *Marx* test. *See In re Comverse*, 866 N.Y.S.2d, 15–16. But the *Wandel* complaint stood in stark contrast, as it "fail[ed] to plead with the requisite particularity that the [BB&B] directors had specific information or reason to inform themselves about the details of the issuance of stock options, and failed to do so." *Wandel*, 871 N.Y.S.2d at 105.

The Amended Complaint fails the second *Marx* test for the same reason as *Wandel*'s. Plaintiffs ask the Court to take from the facts alleged that the Individual Defendants knew (i) that AEP was contributing to EOE, (ii) that EOE was contributing to Generation Now, and (iii) that Generation Now was established as a mechanism for Larry Householder to receive undisclosed contributions in exchange for specific official action. The pleadings will not bear it. Plaintiffs do not allege facts establishing that the Board knew about—let alone, approved—AEP's contributions to EOE. Nor do they allege that the Board knew the ultimate disposition of those funds. And although the Amended Complaint does establish that the Board reviewed political contributions, lobbying activities, and lobbying expenditures, it does not provide the Court with any reason to infer that AEP's contributions to 501(c)(4) organizations were included among those categories. Without these or similar allegations, the Court cannot reasonably charge the Board with knowledge of the Householder bribery scheme. *City of Tallahassee Ret. Sys. v. Akerson*, Index No. 601535/08, 2009 WL 6019489 (N.Y. Sup. Ct. Oct. 16, 2009) (explaining that "sweeping statements that the individual defendants knew or should have known . . . about the wrongdoing of others, without any underlying

14

facts in support, are not sufficiently particularized to meet the rigorous statutory pleading requirement") (internal quotations and citations omitted).

### 3. Plaintiffs have not alleged with particularity that the Demand Board failed to exercise its business judgment.

The third circumstance in which demand would be futile is when "the directors failed to exercise their business judgment in approving the transaction." *Marx*, 666 N.E.2d at 1039. This test is met when "the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment[.]" *Id*. at 1041. Plaintiffs spend a significant portion of their brief trying to persuade the Court that the Individual Defendants "approved a business plan whereby AEP made political contributions to Householder to ensure the passage and preservation of HB 6." (ECF No. 29, PAGEID # 855.) It is a transparent Hail Mary pass. Plaintiffs say a prayer as they launch this illegal-business-plan argument into the air—but offer no facts to complete the pass.

In sum, Plaintiffs fail to allege with particularity that a pre-suit demand on the Demand Board would have been futile. Accordingly, they lack standing to bring suit. Defendants' Motion to Dismiss is **GRANTED**.

15

## II. MOTION TO INTERVENE

The Court now turns to whether Mr. Speiser should be permitted to intervene as a named plaintiff. Like Ms. Kogus and Mr. Reese, Mr. Speiser is an AEP shareholder seeking "to protect the shareholder rights of" AEP by bringing suit against current and former officers and directors. (Mot. to Intervene, PAGEID # 888; *see also* ECF Nos. 31-2, 31-3.) He moves under Rule 24(b) to intervene to, among other things "fil[e] an operative complaint." (Mot. to Intervene, PAGEID # 892.)

Federal Rule of Civil Procedure 24(b) provides, in relevant part:

> **(b) Permissive Intervention.**
>
> **(1) In General.** On timely motion, the court may permit anyone to intervene who: . . .
>
> (B) has a claim or defense that shares with the main action a common question of law or fact. . . .
>
> **(3) Delay or Prejudice.** In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

The Sixth Circuit has explained:

> To intervene permissively, a proposed intervenor must establish that the motion for intervention is timely and alleges at least one common question of law or fact. Once these two requirements are established, the district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors to determine whether, in the court's discretion, intervention should be allowed.

*United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005) (citing *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997)). Here, even assuming that Mr. Speiser's Motion is timely and sufficiently establishes commonality, the attendant facts and circumstances weigh against granting the Motion.

16

Mr. Speiser was the named plaintiff in a virtually identical shareholder derivative action venued in New York state court. *See Speiser v. Akins*, Index No. 605225/2021 (N.Y. Sup. Ct., commenced on April 27, 2021). On September 13, 2022, the New York court dismissed Mr. Speiser's action because "there [was] another action pending between the same parties for the same cause of action" in another court—namely, this action. *Id.*, (docket no. 121) (citing N.Y. C.P.L.R. § 3211(a)(4)). In so doing, the court observed:

> [T]here can be no serious question that the instant causes of action arise out of the same subject matter or series of alleged wrongs. Indeed, [Mr. Speiser's] opposition does not even dispute this, it merely attempts to persuade this Court that his complaint is the superior complaint because it contains slightly different causes of action and because Plaintiff sought AEP's books and records prior to filing his complaint. These assertions are of no moment. There are plaintiffs asserting the rights of AEP's stockholders in the Ohio actions, those actions were filed first, and principles of comity dictate that they be given preference.

*Id.*, 5.

Mr. Speiser seeks to intervene based on the same general argument of pleading superiority. (*See, e.g.*, ECF No. 36, 9 (arguing that "[b]eing forced to defend against a superior complaint is not the sort of 'prejudice' which might militate against intervention").) That is insufficient in view of the circumstances. First, this is a derivative action. It belongs to, and any damages will accrue to, AEP. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991). Mr. Speiser, Ms. Kogus,

17

and Mr. Reese are all AEP shareholders seeking to protect AEP's interests. Their interests are not only aligned—they are identical.[7]

Next, although Mr. Speiser asserts that the operative Amended Complaint is "incomplete," he identifies only three facts that his proposed complaint would add. (*See* ECF No. 36, 3 (noting that (i) AEP received a second subpoena for documents in October 2022, (ii) AEP employees corresponded with legislative aides about HB6, and (iii) AEP published Corporate Accountability Reports stating that lobbying activities and political contributions are reviewed by the Board and publicly disclosed).) Crucially, none of those facts are relevant to the question of demand futility. *Cf. Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) (explaining that motions for leave to amend under Rule 15 "should be denied if the amendment . . . would be futile") (quotation omitted). Finally, Mr. Speiser's assertion that he made a books-and-records demand on AEP is, once again, "of no moment," as the Amended Complaint incorporates the fruits of Mr. Reese's demand. In consideration of these factors, the Court declines to extend its discretion to permit Mr. Speiser's intervention.

Mr. Speiser's Motion to Intervene is **DENIED**.

---

[7] It is perhaps in recognition of this fact that Mr. Speiser purports to move under Rule 24(b), and not Rule 24(a) (providing for intervention of right, except when "the applicant's interest is adequately represented by existing parties"). *See Michigan*, 424 F.3d at 443 (explaining that a movant under Rule 24(a) "must overcome the presumption of adequate representation that arises when [the proposed intervenor and the existing parties] share the same ultimate objective as a party to the suit").

18

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Amended Verified Shareholder Derivative Complaint (ECF No. 24) is **GRANTED** and non-party David Speiser's Motion to Intervene (ECF No. 31) is **DENIED**. Plaintiffs' Amended Complaint is **DISMISSED with prejudice**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**